## BROKESHOULDER v. BROKESHOULDER et al.

No. 12580—Opinion Filed Nov. 29, 1921.

Rehearing Denied Jan. 24, 1922.

(Syllabus.)

**1. Marriage — Validity — Presumptions — Burden of Proof.**

Where a marriage has been consummated in accordance with the form of the law, the law indulges a strong presumption in favor of its validity. One who asserts the invalidity of such a marriage, because one of the parties thereto has been formerly married and the spouse of such former marriage is still living, has upon him the burden of proving that the first marriage has not been dissolved by divorce or by lawful separation. (Hale v. Hale, 40 Okla. 101, 135 Pac. 1143.)

**2. Same — Rebuttable Presumptions — Sufficiency of Evidence.**

The presumption arising in favor of the validity of a second marriage is not a conclusive presumption, but is what is known as a rebuttable presumption, and the one contending against the legality of the second marriage is not required to make plenary proof of a negative averment. It is enough that he introduce such evidence as, in the absence of all counter testimony, will afford reasonable grounds for presuming that the allegation is true, and when it is done the onus probandi will be thrown on his adversary.

**3. Same.**

The evidence of the plaintiff in error in this case, who attacks the validity of the

marriage of one of the defendants in error on the ground that the deceased at the time of his second marriage was incompetent to enter into the marriage relation because of his former marriage to the plaintiff in error, examined, and held sufficient to meet the above requirements.

### 4. Bastards—Legitimacy—Inheritance.

Under section 8420, Rev. Laws of 1910, which provides: "The issue of all marriages null in law, or dissolved by divorce, are legitimate"—a child born of a marriage contracted and consummated in accordance with the form of the law, which for any reason (such as one of the parties having a living spouse undivorced) is invalid, is legitimate, and inherits and transmits by descent as though born in lawful wedlock. (Copeland v. Copeland, 73 Oklahoma, 175 Pac. 764.)

On Petition for Rehearing.

### 5. Marriage—Presumption of Validity.

The presumption of removal of prior obstacles in support of a marriage does not prevail where it is attacked and evidence introduced on either side, but the question then becomes one of fact, to be decided in the light of all the circumstances and the reasonable inferences from them. (Turner v. Williams [Mass.] 24 L. R. A. [N. S.] 1199. Also Editor's Note, 16 L. R. A. [N. S.] 98, 99.)

### 6. Same—Estoppel to Deny Validity.

The rule as to estoppel arising from the marriage relation is that where a marriage is shown to be illegal and void ab initio, neither of the parties by any acts become as against the other estopped to deny its existence, but if one of the parties to such marriage has, by false representations as to the existence of a legal impediment, induced the other to enter into the marriage relation, such party so representing will, where the other has continued to act upon such representation, after the impediment has been removed, be estopped to deny their truth. (26 Cyc. 867-8)

### 7. Same — Attack by Wife Upon Validity of Second Marriage.

Held, that the facts in the record in this case are not such as to constitute an estoppel denying the right of a wife to a first marriage to attack the validity of the second marriage.

### 8. Same—Sufficiency of Evidence.

In determining which of the two women is the legal, surviving widow of a deceased husband, where it is not denied that a legal marriage was consummated between the deceased husband and the first wife, and that the deceased husband had lived with the first wife four years, by whom he had one child, and then abandoned the wife and child and moved to another state, in which state, and in less than two years after so abandoning his wife and child, he marries another women, and the first wife continuing to reside in the county in which she and the deceased husband had lived, and she so continued to reside up to the time and after the consummation of the second marriage by the deceased husband, and she not having remarried up to the time of the second marriage of the deceased husband, and the records in the counties in which he and she resided up to the time the deceased husband contracted the second marriage show no divorce by either, the presumption as to the legality of said second marriage of the deceased husband is rebutted thereby, and said second marriage must be held invalid.

### 9. Same—Burden of Proof—Presumptions.

If a prior marriage is shown to have existed at the time of the second marriage, the burden of proving the removal of the impediment by death or divorce and of the creation of a legal marriage after the removal of the impediment, rests upon the party asserting the validity of the second marriage. This is so since a relation illicit in its inception is presumed to continue in the absence of countervailing evidence.

Error from District Court, Johnston County; J. H. Linebaugh, Judge.

Proceeding to determine heirship in re estate of Cammack Brokeshoulder, deceased. Judgment for Ruby Brokeshoulder and others, and Josephine Brokeshoulder brings error. Reversed and remanded.

C. B. Stuart, C. A. Coakley, and O. G. Rollins, for plaintiff in error.

Cornelius Hardy, for defendants in error.

ELTING, J. This was originally a proceeding commenced in the county court of Johnston county instituted by Ruby Brokeshoulder in the matter of the estate of Cammack Brokeshoulder, deceased, Ruby Brokeshoulder, administratrix, for the purpose of having heirship declared, and Josephine Brokeshoulder intervened in said proceeding and contended that she was the lawful wife of Cammack Brokeshoulder and that Ruby Brokeshoulder was not the lawful wife of Cammack Brokeshoulder. In said hearing in the county court the issue was determined against Josephine Brokeshoulder and Ruby Brokeshoulder was declared to be the lawful wife of Cammack Brokeshoulder, deceased, and declaring that Josephine Brokeshoulder was not the lawful wife and not entitled to inherit.

Josephine Brokeshoulder also claimed that she was entitled to be the administratrix or entitled to nominate the administrator of the estate of Cammack Brokeshoulder in lieu of Ruby Brokeshoulder, who had theretofore been appointed administratrix. In

the event Josephine Brokeshoulder was declared the lawful wife, then she would have the right to select and nominate the administrator. All of these issues were found against Josephine Brokeshoulder and in favor of Ruby Brokeshoulder in the court.

Josephine Brokeshoulder appealed from the order and finding of the county court to the district court of Johnston county, and in the trial of said matter the district court affirming the judgment of the county court, and Josephine Brokeshoulder has appealed from the judgment of the district court affirming the judgment of the county court to the Supreme Court.

The essential facts in this case are: That Cammack Brokeshoulder was a Mississippi Choctaw Indian, and that in 1906 he left Kemper county, Miss., and came to Oklahoma for the purpose of establishing his right to the selection of an allotment as a Mississippi Choctaw. He established his right and was enrolled as a Mississippi Choctaw and received a full allotment of land as such Mississippi Choctaw, which land and the proceeds thereof constitute his estate, and the question as to which one, Ruby or Josephine Brokeshoulder, has the right as his surviving widow to share therein is the question that is involved in this action.

In the meantime Cammack Brokeshoulder had returned to Kemper county, Miss., and on the 29th day of September, 1908, at Moscow, Kemper county, Miss., he was married to Josephine Brokeshoulder according to the laws of the state of Mississippi, under a marriage license duly issued by the proper authority in Kemper county. This marriage was performed by an Indian preacher named S. J. Tubby. On May 30, 1912, there was born of said marriage one child, Mabel Ellis Brokeshoulder. Cammack Brokeshoulder and Josephine Brokeshoulder, nee Silistan, lived together in Kemper county, Miss., from the date of said marriage until November, 1912, as man and wife, and during such time, as heretofore stated, Mabel Ellis Brokeshoulder was born of said marriage.

In November, 1912, the deceased, Cammack Brokeshoulder, left the state of Mississippi and came to Carter county, Okla., leaving his wife and child, as heretofore mentioned, in Kemper county, Miss. Cammack Brokeshoulder lived with some one of his brothers in Carter county for a time, and then moved to Johnston county, state of Oklahoma, where he resided with another brother. While living in Johnston county, and on July 18, 1914, he was married to the defendant in error, Ruby Brokeshoulder, at Ardmore, in Carter county, Okla., having procured a license under the laws of the state of Oklahoma. Cammack and his second wife resided at and near Pontotoc, in Johnston county, Okla., from date of said marriage until his death. To this second marriage there were born two children, Corrine and Cammack Brokeshoulder, Jr.

In March, 1920, Cammack Brokeshoulder died in Johnston county, Okla., intestate.

It also appears from the record that Josephine Brokeshoulder was married to Edgar Tubby on November 13, 1915, in Kemper county, Miss.

These facts as above detailed are admitted, or at least they are proved and not controverted.

The issue in this case is the question of the legality of the second marriage by Cammack Brokeshoulder with Ruby Brokeshoulder consummated in Carter county, Okla., July 18, 1914. It being admitted that there was a legal marriage consummated between Josephine Brokeshoulder and Cammack Brokeshoulder in Kemper county, Miss., in 1908, and if said first marriage was a legal and subsisting marriage at the time of the second marriage, then it necessarily follows that the second marriage was illegal, void, and of no effect. The plaintiff in error contends that the marriage between her and Cammack Brokeshoulder was never dissolved and was a legal and subsisting marriage at the time Cammack Brokeshoulder consummated his marriage with Ruby Brokeshoulder. The defendant in error contends that the marriage between Cammack Brokeshoulder and Josephine Brokeshoulder was not a legal and subsisting marriage at the time of the second marriage, and that the second marriage was a legal marriage.

It necessarily follows that if the contention of the plaintiff in error is correct, then the judgment of the county and district courts of Johnston county, Okla., was erroneous and incorrect; if the contention of Ruby Brokeshoulder is correct, then said judgment is a valid judgment. If the judgment of the district court is sustained in this appeal, then Ruby Brokeshouler is an heir of Cammack Brokeshoulder as his surviving widow and entitled to an undivided one-fourth ($\frac{1}{4}$) interest in his estate. If Josephine Brokeshoulder, nee Silistan, was the legal wife of Cammack Brokeshoulder at the time of his death in

Johnston county, Okla., then, in that event, said Josephine Brokeshoulder is an heir of Cammack Brokeshoulder, and under the admitted facts in this case she would be entitled to an undivided one-third (⅓) interest in said estate.

At a hearing of this cause the evidence of divers and sundry witnesses was taken upon the issues involved. Most of the evidence was taken by deposition and was read to the trial court. The plaintiff in error and defendant in error were both present at the trial and testified therein. At the close of the evidence offered and introduced by the various witnesses the trial court made the following finding of fact and conclusion of law:

### "Finding of Fact.

"That Cammack Brokeshoulder, Sr., deceased, was a Mississippi Choctaw Indian by blood and duly enrolled as such by the Commission to the Five Civilized Tribes; that he died intestate in Johnston county, state of Oklahoma, on the 8th day of March, 1920, and that at the time of his death Johnston county, Oklahoma, was his permanent home and place of residence and that the county court of Johnston county, Oklahoma, has and had jurisdiction of the settlement and administration of the estate of said Cammack Brokeshoulder, deceased.

"2. That said Cammack Brokeshoulder, Sr., and Josephine Brokeshoulder, nee Silistan, were legally married in the state of Mississippi in the year 1908 and of this marriage there was one child born, viz., Mabel Ellis Brokeshoulder, a minor,. and said child is a legitimate child and an heir of said Cammack Brokeshoulder, deceased.

"3. That Cammack Brokeshoulder left the state of Mississippi about the year 1912, returning to Carter county, Oklahoma, where he and Ruby Brokeshoulder, nee Cathey, were legally married according to the laws of the state of Oklahoma, and of said marriage the following children were born and are now living, viz.: Corrine Brokeshoulder, a minor, and Cammack Brokeshoulder, Jr., a minor.

"4. That in the year 1914 Josephine Brokeshoulder, nee Silistan, filed in the chancery court of Neshoba county, Mississippi, a petition for divorce from Cammack Brokeshoulder and that thereafter in the year 1915, in the same county at the same town, the county clerk issued a marriage license authorizing the solemnization of the rights of matrimony, uniting in marriage Edgar Tubby and said Josephine Brokeshoulder and that said persons were married in said county and thereafter lived in said county as husband and wife; that said Cammack Brokeshoulder, Sr., and Josephine Brokeshoulder, nee Silistan, were

divorced prior to the marriage of Cammack Brokeshoulder and Ruby Brokeshoulder, nee Cathey, and that the children of the marriage of Cammack Brokeshoulder are the legitimate children and the heirs of said Cammack Brokeshoulder deceased."

### "Conclusions of Law.

"1. That the marital relation existing between Cammack Brokeshoulder and Josephine Brokeshoulder was dissolved by divorce prior to the marriage of Ruby Brokeshoulder and Cammack Brokeshoulder.

"2. That the marriage of Cammack Brokeshoulder and Ruby Brokeshoulder was legal.

"3. That Ruby Brokeshoulder is the legal wife and the surviving wife and widow of Cammack Brokeshoulder, deceased, and as such entitled to share in his estate.

"4. That Josephine Brokeshoulder, nee Silistan, was divorced from the said Cammack Brokeshoulder and was not the surviving widow of Cammack Brokeshoulder at the time of his death and is not entitled to share in his estate and that she is not an heir of said Cammack Brokeshoulder, deceased.

"5. That the child of Cammack Brokeshoulder and Josephine Brokeshoulder, to-wit, Mabel Ellis Brokeshoulder, a minor, is the child and legal heir of Cammack Brokeshoulder, deceased, and as such entitled to share in his estate.

"6. That the children of Cammack Brokeshoulder and Ruby Brokeshoulder, to-wit, Corrine Brokeshoulder, a minor, and Cammack Brokeshoulder, Jr., a minor, are the children and legal heirs of Cammack Brokeshoulder, deceased, and as such entitled to share in his estate."

"To the court's findings of fact and conclusions of law that Josephine Brokeshoulder was not the wife of Cammack Brokeshoulder, deceased, at the time of his death and was not an heir and entitled to participate in the distribution of the estate of the said Cammack Brokeshoulder. deceased, the defendant Josephine Brokeshoulder, excepts."

Before taking up a discussion of the facts in this case, as shown by the record, we will first lay down the rules of law defining the presumptions and burdens of proof that are applicable to the issue herein. Two fundamental facts are admitted in this case. The marriage of Cammack Brokeshoulder and Josephine Brokeshoulder, nee Silistan, on September 29, 1908, in Kemper county, Miss., is not denied. The marriage of Cammack Brokeshoulder to the defendant in error Ruby Brokeshoulder on the 18th day of July, 1914, in Carter County, Okla., is not denied. It is agreed

by the parties to the suit that the rules as to the presumptions and burdens of proof, as enunciated in the following cases, are the correct rules: Locust v. Caruthers, 23 Okla. 373, 100 Pac. 520; Coachman v. Sims, 36 Okla. 536, 129 Pac. 845; Hale v. Hale, 40 Okla. 101, 135 Pac. 1143; Chancey v. Whinnery, 47 Okla. 272. 147 Pac. 1036; James v. Adams, 56 Okla. 450, 155 Pac. 1121; Lewis v. Lewis, 60 Okla. 60, 158 Pac. 368; Crickett v. Harden, 60 Okla. 57, 159 Pac. 275; Jones v. Jones, 63 Okla. 208, 164 Pac. 463; In re Sanders' Estate, 67 Oklahoma, 168 Pac. 197; Coleman v. James, 67 Oklahoma, 169 Pac. 1064; Thomas v. James, 69 Oklahoma, 171 Pac. 857; Linsey v. Jefferson, 68 Oklahoma, 172 Pac. 641; Johnson v. Dunlap, 68 Oklahoma, 173 Pac. 359; Copeland v. Copeland, 73 Oklahoma, 175 Pac. 764; Clarkson v. Washington, 38 Okla. 4, 131 Pac. 935; Zimmerman v. Jones, 59 Okla. 253, 159 Pac. 305; Meagher v. Harjo, 72 Oklahoma, 179 Pac. 757; Hughes v. Kano, 68 Oklahoma, 173 Pac. 447; Carney v. Chapman, 247 U. S. 102, 38 Sup. Ct. 449.

The rule as deduced from these cases by this court is that where an actual marriage has been solemnized according to the methods prescribed by law, every inference is to be invoked in support of the validity of said marriage and against the validity or existence of any antecedent marriage. In other words, the legal presumption arises that validates and a legal presumption persists in favor of the validity of the last marriage. This rule is admitted to be the rule that is applicable to the situation in this case by both the plaintiff in error and defendant in error. The plaintiff in error in this case assumed the burden of showing that the marriage of the defendant in error, Ruby Brokeshoulder, to Cammack Brokeshoulder, deceased, was invalid. The presumption of the legality of the Carter county marriage is not a conclusive presumption and may be overcome by competent evidence, and when this is done, the burden is shifted to the one contending that the second marriage is valid. This rule is laid down in the case of Copeland v. Copeland, heretofore cited:

"Where a marriage has been consummated in accordance with the form of the law, the law indulges a strong presumption in favor of its validity. One who asserts the invalidity of such a marriage, because one of the parties thereto has been formerly married and the spouse of such former marriage is still living, has upon him the burden of proving that the first marriage has not been dissolved by divorce or lawful separation."

In the body of the opinion of Copeland v. Copeland, it will be noted that a rule was laid down by Mr. Freeman in his notes to the case of Pittinger v. Pittinger (Colo.) 89 Am. St. Rep. 200, as follows:

"If it is conceded that a person attacking a marriage, on the ground that a former spouse of one of the parties is living, must show that the first marriage has not been dissolved, still he is not required to make plenary proof of such negative averment. **It is enough that he introduces such evidence as, in the absence of all counter evidence, affords reasonable grounds for presuming the allegation true. When this is done the onus probandi is thrown on his adversary.**"

In Elizabeth Schmisseur et al. v. August Beatrie et al., 147 Ill. 210, is announced the following rule (syllabus, par. 7):

"Although the burden was upon the complainants of proving negative contention that a divorce had not been obtained before the last marriage, yet it is well settled that a party is not required to make plenary proof of a negative averment. It is enough that he introduces such evidence as, in the absence of all counter testimony, will afford reasonable grounds for presuming that the allegation is true, and when this is done, the onus probandi will be thrown on his adversary."

To the same effect is the case of Turner v. Williams, 202 Mass. 500, 89 N. E. 110, 24 L. R. A. (N. S.) 1199, 132 Am. St. Rep. 511. See, also, Williams v. Williams, 63 Wis. 58, 23 N. W. 110, 53 Am. Rep. 253; Barnes v. Barnes et al. (Iowa) 57 N. W. 851.

The question of whether there was or there was not a divorce dissolving the marriage of Josephine Brokeshoulder and Cammack Brokeshoulder is material, as bearing upon the question of the validity of the marriage of Ruby Brokeshoulder and Cammack Brokeshoulder, deceased. This law, as defined in the authorities heretofore cited and quoted, is an expression of the various presumptions that exist for and against the validity of these marriages, and also discusses and lays down the rules relative to the burden of proof and shifting of the same. While the courts state that the inclination of the courts is to jealously guard the validity of a marriage, and state that there is a strong presumption in favor of its legality, yet they nowhere hold that these presumptions are conclusive, but hold that they are rebuttable presumptions and are subject at all times to be overcome by either negative or positive proof, or both. We have cited and quoted the authorities laying down these rules or presumptions and burdens;

we, however, are going to quote the fourth paragraph of the syllabus in the case of Chancey v. Whinnery, heretofore cited, which is as follows:

"The law is so positive in requiring a party who asserts the illegality of a marriage to take the burden of proving it that such requirement is enforced, even though it involve the proving of a negative."

Our interpretation of this fourth paragraph of the syllabus is that the proof or admission of a prior legal marriage is not within itself sufficient to rebut the presumption of the validity of the second marriage, and that while the burden is upon the one attacking the validity of the second marriage, it is not necessary for him to prove absolutely and to a moral certainty that the first marriage has not been dissolved, but the burden is met if he introduces sufficient evidence to negative the fact that the first marriage has been dissolved.

We have reviewed the authorities cited by the defendant in error in her brief, and we do not find the holding of those cases to be in conflict with the holdings in the instant case, nor with the rule announced in Copeland v. Copeland, 73 Oklahoma, 175 Pac. 764, and they are merely a reiteration of the rule of presumptions in favor of the validity of marriages. It has been suggested that possibly the rule of this court has been to announce a liberal rule of interpretation of the marriage relation between Indians, but that rule of liberality, if one has been announced, is only applicable when considering the marriages as consummated according to the laws and customs of the tribes, and where the Indians enter into the marriage relation under the laws of the state, they are bound by the same rules as are other citizens, as laid down in the fifth syllabus paragraph of the case of Chancey v. Whinnery, which is as follows:

"The rule announced in the second preceding paragraph is not affected by the fact that the parties to the respective marriages are Indians, and that the marriages under review were entered into according to the customs and usages of the tribal authorities."

The evidence in this record shows that Cammack Brokeshoulder had been a resident of Kemper county, Miss.; that he had also during his lifetime resided in Carter county, Okla., and Johnston county, Okla., and those were the only three counties in any state where he had ever established any permanent residence. The evidence, as shown by the record, shows that Josephine Broke-shoulder, nee Silistan, had during her lifetime and up to the time of this trial only resided and had her permanent residence in Kemper county, Miss., but had resided a short time in Neshoba county, but not for sufficient length of time to establish a permanent residence, and had resided in no other state or county, but that she had been temporarily employed in New Orleans and in one other place in the state of Louisiana.

The plaintiff in error assumed the burden and introduced proof bearing upon the question as to whether the original marriage between Josephine Brokeshoulder, nee Silistan, and Cammack Brokeshoulder had ever been dissolved by divorce, and in pursuance of this burden she took the deposition of the chancery court clerk of Kemper county, state of Mississippi, who testified in substance that no decree of divorce or application therefor had ever been filed in Kemper county, Miss., to set aside the original marriage between Josephine Brokeshoulder and Cammack Brokeshoulder.

At the request of the defendant in error's attorney the deposition of the chancery court clerk of Neshoba county, Miss., was also taken, and in answer to questions by the attorney for defendant in error, Ruby Brokeshoulder, the clerk produced an application or petition for divorce as having been filed in the chancery court of Neshoba county entitled Josephine Brokeshoulder v. Cammack Brokeshoulder, and the file date was August 22, 1914. The said chancery clerk, in answer to questions in cross-examination by the attorney for Josephine Brokeshoulder, stated in substance that he had examined the records and files of the chancery court of Neshoba county, Miss., and that said records failed to show anything pertaining to said divorce except the petition, or that a trial was ever had, and there was no record of any decree of said court showing that a decree had ever been entered dissolving the marriage relation of Cammack Brokeshoulder and Josephine Brokeshoulder in Neshoba county, Miss. The clerk further stated that he had no personal knowledge of any decree or other proceeding ever having been taken upon said petition, and that in his judgment nothing had ever been done and the case had been abandoned.

In the trial of the cause in the county court, Josephine Brokeshoulder went upon the stand and testified pertaining to said divorce matter as between her and Cammack Brokeshoulder in this wise: That she had never procured a divorce from Cammack Brokeshoulder. She stated that she did not

know anything about a divorce. Then she was asked if she had not on the 13th day of November, 1915, married one Edgar Tubby, in Kemper county, Miss., and she admitted that she had. Then she was asked if she had not procured a divorce, why she married Edgar Tubby, and her answer was that Cammack Brokeshoulder had left and she did not expect him to return, and that she was informed he was divorced. This evidence was taken of Josephine Brokeshoulder in the county court; was taken down in shorthand and by agreement was used in the trial in the district court.

The attorney for the defendant in error in his brief discusses what he calls the contradictory evidence of the plaintiff in error, Josephine Brokeshoulder, given in the county court. She denied in the first part of her evidence that she had any knowledge of petition having been filed, or that she had signed one; denied consulting a lawyer or that she knew lawyer Ware. On redirect examination she testified about talking with some lawyer about the divorce, but that he told her that she did not have any grounds for a divorce. The lawyer whom it was asked if she had consulted was a lawyer with a different name than that of the one on the petition. The evidence of the clerk of the court where the petition was filed, wherein he testified that the only evidence on the record of the court of the divorce proceeding was of the filed petition, while negative in its character, tends to corroborate Josephine Brokeshoulder's positive statement that no divorce was procured. It is further contended by the attorney for the defendant in error in his brief that the failure of the plaintiff in error to procure the evidence of the lawyer relative to this divorce proceeding should be considered against the plaintiff in error, but we do not think that the failure to take this evidence raises a presumption against one more than the other party to this litigation. We have no knowledge of what the attorney would testify to relative to the divorce proceeding, and the right to take the evidence of these attorneys was as much the privilege of one as the other of these parties litigant.

The plaintiff in error, in discharging the burden of showing the illegality of the marriage between Cammack Brokeshoulder and Ruby Brokeshoulder, called the court clerks of Carter and Johnston counties as witnesses in the trial of the cause in the county court, and they testified from their records that no divorce dissolving the marriage between Cammack Brokeshoulder and Josephine Brokeshoulder had ever been entered or decreed by the district courts of those two counties. The evidence of the court clerks was taken by shorthand in the county court and by agreement was used in the trial of the cause in the district court.

It is not denied, and is admitted, at least by implication, by the defendant in error that Cammack Brokeshoulder never established a permanent residence in any other counties or state except Kemper county, Miss., and Carter and Johnston counties, state of Oklahoma. There was some contention in the trial in the county court that Cammack Brokeshoulder had resided for a short time in Pittsburg county, Okla., but it was admitted in the record in the trial of the cause by the attorney for the defendant in error in the district court that no decree of divorce had ever been procured by Cammack Brokeshoulder in Pittsburg county, Okla. The record in this case discloses that the defendant in error made no contention that Cammack Brokeshoulder had ever procured a divorce dissolving the marriage between him and Josephine Brokeshoulder, and where, and the only contention of the defendant in error that the marriage between Cammack Brokeshoulder and Josephine Brokeshoulder was dissolved was based upon the presumption arising from the validity of the second marriage and upon one item of proof—the introduction and proof of the filing of the petition for divorce in Neshoba county, Miss., on the 22nd day of August, 1914. It is upon this proof and the presumption heretofore stated that the defendant in error relies to sustain the validity of the marriage of Cammack Brokeshoulder and Ruby Brokeshoulder, and no other, as against the proof of the plaintiff in error.

The best evidence of a decree of divorce is the record of the written decree of the court that granted the order. While there are courts that hold that where there is no decree of record in the trial court the proof of the absence of such decree has the effect of making any alleged divorce a nullity. See Medlin v. Platt County, 8 Mo. 117. 33 Mo. 168. In this case it was proven by the plaintiff in error that there was no decree of record ever entered in Neshoba county as a result of filing the petition; that there was nothing in the files of said court showing that said decree had ever been procured. There are no recitals on the record showing a decree, and even if there were any presumptions arising that a decree had ever been granted by reason of the proof

of the filing of the petition, this evidence drawn out by the plaintiff in error in cross-examination is sufficient to rebut any presumptions that might arise from the filing of said petition.

The Supreme Court of this state in the case of Ex parte Stevenson, 20 Okla. 549-551, 94 Pac. 1071, speaking through Mr. Justice Kane, stated the rule as follows:

"The record entry of a judgment is indispensable to prove the evidence of it when it is made the basis of a claim or defense in another court. * * *

"The necessity of entering judgments and the importance thereof is well stated in 1 Freeman on Judgments, 37:

"'The promptings of the most ordinary prudence suggest that whatever in the affairs of men has been so involved in doubt and controversy as to require judicial investigation ought, when made certain by a final determination, to be preserved so by some permanent and easily understood memorial. Hence all courts and all tribunals possessing judicial functions are required by the written or unwritten law, and often by both, to reduce their decisions to writing in some book or record kept for that purpose. The requirement is believed to be of universal application.'

"Judge Freeman in the same section, discussing the effect of nonentry, says:

"'While the entry is not the judgment, its absence tends strongly to indicate that no judgment exists.'"

It appears from this record, furthermore, that, as heretofore stated, the defendant in error undertook to prove the existence of a divorce in Neshoba county, Miss., and her proof consists of the fact that a petition had been filed in the chancery court of Neshoba county, Miss., on the 22nd day of August, 1914. This record discloses the fact, and it is admitted by the defendant in error in her brief, that Cammack Brokeshoulder procured a license in Ardmore, Carter county, Okla., on the 18th day of July, 1914, authorizing him to enter into the marriage relation with one Ruby Cathey, and that on the same date the record shows that Cammack Brokeshoulder and Ruby Cathey were married. In other words, 35 days prior to the time of the filing of the petition for a purported divorce in Neshoba county, Cammack Brokeshoulder entered into a marriage with Ruby Cathey, now Brokeshoulder, thereby admitting that Cammack Brokeshoulder had entered into a marriage relation with another woman 35 days before a purported proceeding had commenced and upon which proceeding the defendant in error had as-

sumed to rely, in this cause, as a proceeding that would validate the marriage between her and Cammack Brokeshoulder.

We have examined the record of this case, and after reviewing the evidence we find that the presumptions arising by law have been overcome by proofs of the plaintiff in error, and that the burdens arising under the issues in this case assumed by the plaintiff in error have been fully and amply satisfied. Therefore, it necessarily follows that the judgment of the trial court in finding that the marriage between Cammack Brokeshoulder and Ruby Brokeshoulder was a valid and subsisting marriage, and that the marriage theretofore existing between Cammack Brokeshoulder and Josephine Brokeshoulder had been dissolved, was erroneous and against the clear weight of the evidence.

It has been suggested that by holding the marriage between Ruby Brokeshoulder the defendant in error, and Cammack Brokeshoulder void and of no effect the legal result of such holding will be to illegitimize the two children of this marriage, which is not the fact. By section 8420, Revised Laws 1910, it is provided as follows:

"Every illegitimate child is an heir of the person who in writing signed in the presence of a competent witness acknowledges himself to be the father of such child; and in all cases is an heir of his mother; and inherits his or her estate, in whole or in part, as the case may be, in the same manner as if he had been born in lawful wedlock; but he does not represent his father or mother by inheriting any part of the estate of his or her kindred, either lineal or collateral, unless before his death his parents shall have intermarried, and his father after such marriage, acknowledges him as his child, or adopts him into his family; in which case such child and all the legitimate children are considered brothers and sisters, and on the death of either of them, intestate, and without issue, the others inherit his estate, and are heirs, as hereinbefore provided, in like manner as if all the children had been legitimate; saving to the father and mother respectively, their right in the estate of all the children in like manner as if all had been legitimate. The issue of all marriages null in law, or dissolved by divorce, are legitimate."

See, in this connection, Copeland v. Copeland, 73 Oklahoma, 175 Pac. 764.

Under the provisions of the above statute these children are held to be legitimate and so declared, and are the heirs of their father, Cammack Brokeshoulder.

Under the conclusions that we have reached in this case, Josephine Brokeshoulder being held herein to be the lawful wife of Cammack Brokeshoulder, at the time of his death, under section 8418, Rev. Laws 1910, there being but one child born to the legal marriage between Josephine Brokeshoulder and Cammack Brokeshoulder, she being the first wife and the only legal wife of the deceased man, and two children also being born under the second marriage which were made legitimate by the statute, then under the facts in this case under the following portions of said cited section of our law, Josephine Brokeshoulder takes one-third (⅓) undivided interest in the estate of her deceased husband, Cammack Brokeshoulder, and the residue of said estate goes in equal parts to the three children. The portion of said section relied upon reads as follows:

"If the decedent leave a surviving husband or wife, and more than one child living, or one child living and the lawful issue of one or more deceased children, one-third to the surviving husband or wife, and the remainder in equal shares to his children, and to the lawful issue of any deceased child by right of representation; but if there be no child of the decedent living at his death, the remainder goes to all of his lineal descendants; and if all the descendants are in the same degree of kindred to the decedent they share equally, otherwise they take according to the right of representation."

This cause is reversed and remanded, with directions to the district court to enter a decree not inconsistent with the holdings herein expressed.

HARRISON, C. J., and JOHNSON, MILLER, and NICHOLSON, JJ., concur.

---

On Petition for Rehearing.

ELTING, J. The attorneys for the defendants in error in their brief on petition for rehearing in this case make serious objection to the rule laid down in the second paragraph of the syllabus in the original opinion by this court in regard to the weight of evidence required in attacking the validity of a second marriage, and which second paragraph of the syllabus reads as follows:

"The presumption arising in favor of the validity of a second marriage is not a conclusive presumption, but is what is known as a rebuttable presumption, and the one contending against the legality of the second marriage is not required to make plenary proof of a negative averment. It is enough that he introduce such evidence as, in the absence of all counter testimony, will afford reasonable grounds for presuming that the allegation is true, and when it is done the onus probandi will be thrown on his adversary."

The rule we lay down is the one set forth in Copeland v. Copeland, 73 Oklahoma, 175 Pac. 764, and the Copeland Case accepted the rule as laid down in an Illinois case, Schmisseur et al. v. Beatrie et al., 35 N. E. 525, and which rule also seems to be the rule set forth by Mr. Freeman in a note to Pittinger v. Pittinger (Colo.) 89 Am. St. Rep. 193, and the same as set forth in the second paragraph of the syllabus in the original opinion in this case, also based upon the laws adduced in the Copeland Case and the Illinois case, and Mr. Freeman's note. In the Illinois case above cited consideration is given to the rule as contended by the attorneys for the defendants in error, even going so far as to designate the legality of the second marriage as being a strong presumption, and due consideration was also given to this rule in the original opinion by this court. The attorneys for the defendants in error, in their brief, contend that the rule laid down in Copeland v. Copeland should be overturned, since it is not the proper rule. We hold that it is a proper one and is supported by strong reason and by very recent authority, as we shall show hereinafter.

The Illinois case that we have just cited was not the first nor the final pronouncement of the Illinois Supreme Court upon this rule. As to whether the rule of presumption should be designated as a strong presumption or merely a bare presumption, as far as the opinion in this case is concerned, we think it makes no difference. We hold this for the reason that in the instant case it was determined upon the question of the weight of evidence and the consideration of circumstances surrounding these parties and the inferences to be drawn therefrom, and the instant case is not a case that can be tried upon the weight and force to be given a legal presumption. It is a question of weight and sufficiency of proofs. It is true, however, that the rule was determined as to the presumption, and we held that one attacking the validity of a second marriage had to overcome the presumption of its legality, and we held that under the facts and circumstances and relations of the parties and the inferences to be drawn from the same the judgment of the trial court

was against the clear weight of the evidence.

As we have heretofore stated, the Illinois case that we have cited was not the first nor the last pronouncement of the Supreme Court of Illinois. In 1887 the Supreme Court of Illinois rendered an opinion in the case of Cartwright et al. v. McGowen, 121 Ill. 388, 12 N. E. 737, while the first case cited from Illinois was rendered in 1893. This last cited case from Illinois states the following:

"The presumption of the capability of Lewis to enter into the marriage contract with Zerelday Cacey, December 8, 1843, is overcome by proof of his prior marriage in Kentucky, and that his wife by that marriage was still living and undivorced at that time. This proof established the fact that the second marriage in 1843 was a nullity, conferring no marital rights whatever. A simple marriage ceremony will not make a man and woman husband and wife. Capacity and consent are absolutely essential, but celebration only contingently so. Thompson v. Thompson, 114 Mass. 566; Merriam v. Wolcott, 61 How. Pr. 377; Rundle v. Pegram, 49 Miss. 751. Nor can sexual intercourse, which the parties know to be contrary to law, form even an element of marriage. Peck v. Peck, 12 R. L. 485; Port v. Port, 70 Ill. 484."

On page 740 of the same authority, we find the following:

"The evidence in the record is amply sufficient to show that Lewis and Zerelday lived and cohabited as husband and wife for a period of about 25 years, and that during all this time he treated her as a man would a wife, and her children as his own, and that they were reputed as husband and wife. But it must be borne in mind that cohabitation and repute do not constitute a marriage, but are only evidence tending to raise a presumption of marriage of more or less strength, according to the circumstances of the case, and that the cohabitation must not be meretricious, but matrimonial, in order to give rise to this presumption. 1 Bish. Mar. & Div. sec. 266. Where a marriage in fact is shown by direct evidence, as in this case, there is no necessity for presuming its existence. **Presumption must yield to the superior force of direct and positive proof.** In this case there was an actual marriage ceremony performed in 1843, by which Lewis and Zerelday were apparently and ostensibly married. Their cohabitation thereafter, and reputation as being married, might very naturally and properly be referred to the fact of this apparent marriage; there being nothing to indicate to their acquaintances and neighbors that it was void. If no actual marriage ceremony had been shown, then the cohabitation and repute proved might be referred to

some supposed informal common-law marriage. This cohabitation and repute is not shown as evidence of the ceremonial marriage in 1843, but of some other kind of marriage entered into some time after the divorce, in December, 1846. Is such cohabitation and repute, based upon a supposed common-law marriage, any more than upon the formal marriage shown by the records to have been entered into in 1843? The habit and repute shown in this case might just as well and more naturally arise from the marriage in 1843. If this evidence could, by any known rule, be so limited as to show a cohabitation and repute from some day after the divorce, when no impediment existed, it might afford evidence of a common-law marriage of the parties by their own acts. If the cohabitation and repute was the result of the assumed marriage in 1843, which was void, it was illicit, and not matrimonial, and no marriage can be presumed from illicit sexual intercourse."

In the case of Cartright v. McGowen, that we are now discussing, the facts are almost identical with the case at bar. The marriage of Lewis to a second wife after leaving Kentucky and going to Illinois was in 1843, not quite two years after he married his wife in Kentucky. This was held to be an illicit marriage under the facts and the rule of presumption laid down. The first wife procured a divorce in Kentucky in 1846, three years after the illicit marriage. This, of course, removed the impediment in the way of Lewis contracting a legal marriage, and then the question arose as to whether a legal or common-law marriage could be presumed upon continued cohabitation with the second wife. As we have heretofore shown, they held it could not. In support of the contention to uphold the legality of the second marriage, they argued the presumption of the death of the first wife. In discussing this presumption of death, and the facts applicable thereto, this last cited case has the following to say:

"In the present case the evidence excludes any presumption of the death of the first wife of Lewis—she being alive after his death; and there can be no presumption that she obtained a divorce before his marriage in 1843, as the evidence shows her divorce was not granted until December, 1846, and the established facts will not justify the court in presuming that he procured a divorce from his prior wife. He was married to Sarah James, April 29, 1841, and lived with her about a year, when he left her, and came to this state, where he was ostensibly married to Zerelday Cacey, December 8, 1843.—only about a year and seven months after his abandonment of his first wife. If he procured any lawful divorce, it must have been in Caldwell county, Kentucky, or in Montgomery county, Il-

linois. If he procured such a divorce, it was a very easy matter to have shown it. Under the circumstances of this case, and taking into consideration the shortness of the time intervening from his desertion of his first wife and his second marriage, it cannot be presumed, in favor of the innocence of the parties, and the legality of the second marriage, that Lewis obtained a legal decree releasing him from his prior marriage."

The year following the rendering of the opinion in the case of Schmisseur v. Beatrie, the Supreme Court of Illinois rendered a decision in the case of Cole v. Cole et al. (Ill.) 38 N. E. 703, in which case said court reaffirmed the doctrine laid down in Schmisseur v. Beatrie, heretofore cited. This last case is also very much in point with the instant case, and we are going to include herein an extended quotation therefrom, giving the facts and the application of the law thereto:

"It is clear from the testimony of Emma Cole, as well as that of other witnesses, that she was legally married to the deceased in Staffordshire. England. on the 13th day of February, 1865, and there lived and cohabited with him for about one year, when he deserted. her, and came to this country. She continued to live in England, and still resides there. He never returned to that country. He married one Amelia Hahn, in Sangamon county, this state. in 1875, and lived with her until about 1887, when she obtained a divorce from him; and he soon after went to Brazil, Indiana, and there, on the 18th of September, 1888, married appellant and lived with her until his death, about one year later.

"The question is, was this last marriage void because of the former one to Emma Cole? Counsel for appellant insist, as a matter of law, that, her marriage being proved, the presumption in favor of its validity is such as to cast the burden upon those questioning it to show its illegality, and therefore that, unless Emma Cole has proved that the marriage between herself and George Cole was never dissolved, his marriage to appellant must be held valid. As a general statement of the rule of evidence in this state in such cases, the proposition is supported in Schmisseur v. Beatrie, 147 Ill. 210, 35 N. E. 525, and cases there cited. But counsel for appellee insist upon the authority of the decision by the Supreme Court of Iowa that the presumption in favor of the validity of a second marriage, where the husband or the wife of the first is shown to be living, only places a burden of proving that the first has not been dissolved when it is shown that the acts and conduct of both parties have in some way been inconsistent with the continuance of the marriage relations: and it is contended that without this qualification great injustice may be done

an innocent wife, through the willful wrong of her husband. She, it may be said, remains true to her marriage vows. He deserts her, without cause, goes to a foreign country, and contracts a second, void marriage. She may be, and generally is, in such a case, powerless to prove that he had not, at some time, in some jurisdiction obtained a divorce. Shall she, upon a mere presumption of his innocence, be deprived of all her rights, as a wife or widow, because she cannot produce such negative proof? We do not think a fair construction of our decisions could legally lead to such a result. In the Schmisseur Case, supra, we said: 'Although the responsibility was upon the complainants of proving the negative contention that a divorce had not been obtained before the marriage of 1876, yet it is well settled that a party is not required to make plenary proof of a negative averment. It is enough that he introduces such evidence as, in the absence of all counter testimony, will afford reasonable ground for presuming that the allegation is true, and when this is done, the onus probandi will be thrown on his adversary. 1 Greenl. Ev. sec. 78.'

"Suppose, as in this case she did, the wife proves her marriage obligations; that her husband, without cause, deserted her; that she had no knowledge of his second marriage until after his death; that she had no personal knowledge of his having obtained a divorce, and her marriage was never dissolved in the jurisdiction where she lived when he deserted her, and where she continued to live to the time of his death. Would not these facts, in the absence of all counter testimony, afford reasonable grounds for presuming that no divorce was obtained? The validity of the second marriage is presumed only because of the presumption which is always indulged in favor of innocence, because of the presumption that a man will not commit the crime of bigamy. But, the foregoing facts being proved by the unoffending wife, the question of innocence is no longer a matter of presumption. The husband had no valid grounds for divorce. To obtain one, he must have sworn falsely himself, or procured others to do so. If her testimony and that of witnesses testifying on her behalf, is true, as to her conduct and his, he could not, without fraud upon a court, or perjury, obtain a divorce. We think, therefore. the evidence that the wife had done nothing inconsistent with her marital duty was sufficient to overcome the presumption in favor of the legality of appellant's marriage, and shift the burden of proving it upon her. Without having critically examined the Iowa cases cited, we apprehend that the only substantial difference between the rule laid down by them and our own decision is as to the burden of proof, in the first instance. to show that the facts and conduct of the first wife or husband have not been inconsistent with the continuance of the marriage relation."

The case of Barnes v. Barnes, heretofore cited and the first paragraph of the syllabus of which we have quoted, was a case where one Emily Bruce sought to take a portion of the property of Ezra Barnes under the statutes of Iowa as his legal wife at the time of his death. Emily's first marriage was with one John Weidman, and after she had resided with him in Illinois for a couple of years they separated, she going to Iowa and he to Wisconsin. In 1858 she filed a petition for divorce in the county in which she lived in Iowa, and dismissed the same that year after suggesting the death of Weidman, and married Ezra Barnes the same year, with whom she lived until 1869, when she separated from him. After Emily had left him, Barnes married another woman and willed his last wife all his property. The question in the case was, was Emily the legal wife of Ezra Barnes at the time of his death? It appears that John Weidman, the first husband of Emily, a year or more after Emily married Barnes, had married another woman in Wisconsin. The Supreme Court of Iowa, discussing this case, distinguished it from the case of Blanchard v. Lambert, 43 Iowa, 228. It appears that the Blanchard Case was decided upon the rule of presumptions alone, and not upon any evidence. The following is taken from the case of Barnes v. Barnes, found on page 852 of 57 N. W.:

"Plaintiff's first contention is that under the authority of Blanchard v. Lambert, 43 Iowa, 228, the law will presume a divorce dissolving the marital relation between plaintiff and Weidman prior to plaintiff's marriage with deceased, from the fact that both she and Weidman thereafter married. In that case the plaintiff and her former husband, Musgrave, separated in 1858, and the plaintiff married Blanchard nearly nine years thereafter. For several years prior, Musgrave was living with a woman who claimed and whom he claimed to be, and who was reputed to be his wife. The plaintiff lived near by, and knew these facts. Upon these facts, the court says: 'The law presumes that this cohabitation of Musgrave was legal, and not criminal, and that he had obtained a divorce from plaintiff.' The facts upon which that presumption was based are quite different from the facts in this case. In that, Musgrave had lived with and recognized the second woman as his wife, to the knowledge of the plaintiff, before her marriage to Blanchard; in this, the plaintiff's husband, Weidman, did not marry Belle Coplin until after plaintiff's marriage to Barnes. There was no evidence whatever in that case to negative the presumption that Musgrave had obtained a divorce, while in this it is shown by the records of each county in which Weidman and the plaintiff had cohabited and resided that no divorce had been obtained therein. This evidence is not conclusive, as it is possible that a divorce might have been obtained elsewhere, but it is certainly sufficient to rebut the presumption that a divorce had been granted, and especially when that presumption has no better foundation than the facts in this case."

It will be observed that Emily Bruce invoked the presumption of the legality of her marriage with Ezra Barnes arising from the fact of her marriage with Barnes and the fact that John Weidman had also remarried. The defendant in error has invoked the same proposition in the instant case. The Iowa court refused to recognize this presumption as applied to the facts in the Barnes Case, and those facts are identical with the situation in the instant case.

These facts we have fully recited herein, except with the additional suggestions that the record in the instant case does not show that Ruby Brokeshoulder knew of the marriage of Josephine Brokeshoulder and Cammack Brokeshoulder, and the record does show that after Josephine had married Edgar Tubby, some 16 months after Cammack had married Ruby, Edgar and Josephine separated in about a month after their marriage and continued separated. The rule seems to be laid down in the case of Barnes v. Barnes that no presumption can arise of a divorce between Cammack and Josephine by reason of the marriage between Josephine and Edgar Tubby, followed as it was, in a very short time, by a continued separation.

To the same effect as the two cited cases and quoted cases from Illinois is the following from Re Colton, 129 Iowa, 542, 105 N. W. 1008:

"In determining which of two claimants is the widow of the deceased, proof that deceased deserted his second wife without cause and had no ground for divorce, and that no divorce was recorded in the respective counties in which they subsequently lived; aided by the presumption that the residence of each continued to be in the same county in which it was taken up after the separation—overcomes the presumption of divorce in favor of the validity of a subsequent marriage of the husband."

Also the following from the Colored Knights of Pythias v. Tucker (Miss.) 46 South. 51:

"In an action by an alleged wife to recover as beneficiary in a policy on a decedent's life, defended upon the ground that she had another husband living when she married the decedent, it is not necessary, in order to overcome the presumption in favor of a divorce from the first husband, that the de-

fendant conclusively prove that no such divorce was granted, it being sufficient if it elicit proof which, in all the circumstances of the case, will produce a conviction in an unprejudiced mind that no divorce had been granted."

Also the following from Hammond v. Hammond (Tex. Civ. App.) 94 S. W. 1067:

"No presumption of divorce from the wife who left him and lived in adultery arises, as a matter of law, upon the remarriage of the husband, whose action for divorce was dismissed."

The three above quoted excerpts are taken from the notes to the case of Smith v. Fuller, 16 L. R. A. (N. S.) found on page 108, and are not exact excerpts from the above cited cases, but are in substance the holdings therein.

It will appear from the case of Schmesseur v. Beatrie, heretofore cited and quoted, that the attorneys contending against the holding in said court contended for the rule of strong presumption, as in the instant case, and discussed the Iowa cases which it was claimed supported the rule of a persisting and strong presumption.

In the year 1909, the Supreme Judicial Court of Massachusetts, in the case of Turner v. Williams, 202 Mass. 500, 89 N. E. 110, 24 L. R. A. (N. S.) 1199, discussed the rule of presumptions applicable in support of the legality of a second marriage in a well-reasoned, logical, and plainly stated ruling, and it is in line with the holding in the Copeland Case and the rule laid down in the original opinion in this case. From said case we quote the following:

"The question to be decided was whether the prior marriage of the defendant's intestate was dissolved at the time of her marriage with the plaintiff's testator. Proof that it was valid and subsisting was the burden assumed by the plaintiff, and this burden rested on him throughout the trial. Although there was oral testimony to the effect that this marital relation had been dissolved by divorce, it was nevertheless open to the plaintiff to argue that the statements to this effect were made by interested persons, who were mistaken, discredited, unreliable, deceived, or deliberately attempting to deceive, and therefore not entitled to belief. It is urged in support of the ruling that the law has such a tender regard for solemnized marriage and for the assumption of innocence as to presume strongly that all apparent obstacles were removed, so that its validity may be established. It has often been decided or intimated by way of dictum that death or divorce of one of the parties to a prior marriage will be presumed in order to support such a second one. Potter v. Clapp, 203 Ill. 592-600, 96 Am. St. Rep.

322, 68 N. E. 81; Hunter v. Hunter, 111 Cal. 261, 31 L. R. A. 411, 52 Am. St. Rep. 180, 43 Pac. 756; Cash v. Cash, 67 Ark. 278, 54 S. W. 744; Re Rash, 21 Mont. 170, 69 Am. St. Rep. 649, 53 Pac. 312; Alabama & V. R. Co. v. Beardsley, 79 Miss. 417-424, 89 Am. St. Rep. 660, 30 So. 660; Scott v. Scott, 25 Ky. L. Rep. 1356, 77 S. W. 1122; Montgomery v. Bevans, 1 Sawy. 653-666, Fed. Cas. No. 9735; Erwin v. English, 61 Conn. 502-510, 23 Atl. 753; Lockhart v. White, 18 Tex. 102; Carroll v. Carroll, 20 Tex. 731; Smith v. Knowlton, 11 N. H. 191-196; Greensborough v. Underhill, 12 Vt. 604; Palmer v. Palmer, 162 N. Y. 130, 56 N. E. 501. This train of cases appears to have had its origin in R. B. Twyning, 2 Barn. & Ald. 386, which 'has been much misunderstood', as is pointed out in Lapsley v. Grierson, 1 H. L. Cas. 498-505, where it is explained. Where there is no extrinsic evidence either way, the legality of a marriage, like sanity, continuance of life, and regularity of acts of public officers, will be assumed. But where it is attacked and evidence is introduced tending to impeach it, then a question of fact arises to be proved in the light of all the circumstances and the reasonable inferences from them. The presumption of innocence is not so much stronger than any other as to compel the assumption of death or divorce in order to infer its existence. The unsoundness of such a contention becomes apparent when applied to every conceivable state of facts. A marriage could not be ruled, as a matter of law, to be valid by reason of the presumption of innocence, if other evidence showed a month or a day before its solemnization one of the parties was living with a legal and youthful spouse of good health and nondangerous employment. The law jealously regards the marriage relation and makes reasonable assumptions in its favor, but it has no special regard for second in preference to first marriage.

"The burden of proof in the absence of conflicting evidence may sometimes determine the result. The state of health, age, occupation, or prospective journey of a given individual may warrant the inference of death within a brief time. But ordinarily whether one is alive on any given date within the period of seven years unexplained absence is a fact to be determined upon all the possibilities arising in a particular case. Circumstances may exist which would make reasonable the inference of a divorce. But there is no inflexible rule by which it can be invoked to protect subsequent nuptials. There is no absolute presumption of innocence which will of itself prove the validity of a subsequent marriage in preference to the continuance of a former one. The validity or invalidity of the marriage drawn in question must be established, by the party upon whom the burden of proof is cast, upon all the facts with the reasonable inferences flowing from them. The law marks no particular consideration as of prevailing consequence in all cases. There is no 'sacra-

mental force' in the presumption of the continuance of life or any other status in its nature likely to endure. Presumptions are rules of convenience based upon experience or public policy, and established to facilitate the ascertainment of truth in the trials of causes. There are a few instances of conclusive presumptions; but where there are conflicting presumptions, one is not, as matter of law, stronger or weaker than another. The whole case, then, is thrown open to be decided as a fact upon all the evidence. It is for the sound judgment of the jury to weigh all the circumstances, including the characters of the persons involved and the probability of different lines of conduct, and determine where the truth lies as a matter of common sense, unfettered by any arbitrary rule. Hyde Park v. Canton, 130 Mass. 505; Com. v. McGrath, 140 Mass. 296-299, 6 N. E. 515; State v. Plym, 43 Minn. 385, 45 N. W. 848; Reynolds v. State, 58 Neb. 49-52, 78 N. W. 483; Williams v. Williams, 63 Wis. 58, 53 Am. Rep. 253, 23 N. W. 110; Casley v. Mitchell, 121 Iowa, 96, 96 N. W. 725; Northfield v. Plymouth, 20 Vt. 582-590; Lapsley v. Grierson, 1 H. L. Cas. 498; R. v. Willshire, L. R. 6 Q. B. Div. 366-370; R. v. Harborne, 2 Ad. & El. 540; R. v. Lumley, L. R. 1 C. C. 196."

The following is taken from the notes by the editor to the case of Smith v. Fuller (Iowa) 16 L. R. A. (N. S.) 98, in which it appears that the writer of the note comes to the same conclusion as the case of Turner v. Williams, supra:

"There are to be found in the books frequent judicial expressions, either actually or in effect, of the general rule that, where a marriage is once shown, it is presumed to be valid until the contrary is shown. This presumption may be compared to the trunk of a tree of which nearly all other presumptions arising from marriage are branches.

"Most important of these branches are the presumption that no impediment existed to a marriage proved to have been contracted, and the presumption, where an impediment is shown in fact to have existed in the form of another marriage, that the impediment ceased to exist before the second marriage by reason of the death or the divorce of the former spouse.

"So, therefore, it will be seen that, generally speaking, the presumption in favor of the validity of a marriage shifts to the second marriage of one who remarries during the life of a former spouse.

"But the courts have sometimes refused to indulge this, and other presumptions, and these refusals serve to take them from the category of absolution and inflexibility, to which apparently they have sometimes been regarded as belonging. Therefore, the judicial expressions that any presumption is a matter of general application must be scrutinized in the light of cases that have refused to apply it in certain circumstances, with the result that it may properly be said that, however commendable the spirit may be that presumes in favor of marriage and legitimacy, the presumption, to be warranted, must be justified by the particular facts of a case, and consonant with what most nearly effects justice in such case."

The attorneys for the defendant in error, in their brief, assert that they have been unable to find anywhere in the books, where both spouses to a first marriage have each contracted a subsequent marriage, that either of the subsequent marriages has been held invalid. The case of Barnes v. Barnes, heretofore cited, is just such a case, and the first paragraph of the syllabus reads as follows:

"Where the records of the counties in which a man and a wife have lived show no divorce, there is no presumption of a divorce in favor of the woman because she marries another, though the first husband also marries another, with whom, however, it is not shown that he lived."

The rule of law is: Where, at the time of contracting a second marriage, one of the spouses has a living husband or wife of a former marriage and such former marriage has not been dissolved, such second marriage is a nullity. The rule thus stated is found in 26 Cyc. 904:

"If either of the parties to the marriage had a lawful spouse living and undivorced at the time, the second marriage is absolutely void and may be so declared by decree of court in proper proceedings."

It might be said that in elucidating the principle derived from the cases of Cartwright v. McGowen, Cole v. Cole, and Barnes v. Barnes, that we have elucidated in this opinion, and that in the application that we make of that principle hereinafter to the facts in the instant case we are applying a principle not applied in the original opinion in the instant case. We do not think that we are applying a new principle, or a principle not heretofore applied, but we have greatly elaborated and given a more extended consideration and discussion to the principle, and it appears that this rule that we have discussed, and are now about to make the application of to the facts in this case was touched on, if at all, very lightly in any of the original briefs.

The scope of the principle and its application to the facts in this case do not appear to have been clearly comprehended either by the attorneys interested or by this court up until the time of the consideration of this petition for rehearing, unless it can be considered to be embraced within the scope of the

principle discussed in the case of Turner v. Williams, which opinion was cited and quoted from in the original brief by the attorney for the plaintiff in error, and it is also cited in the original opinion, and the principle discussed in the editor's note to 16 L. R. A. (N. S.) page 98. A portion of which note, for the purpose of getting the idea we intend to express, we requote as follows:

"Therefore, the judicial expressions that any presumption is a matter of general application must be scrutinized in the light of cases that have refused to apply it in certain circumstances, with the result that it may properly be said that, however commendable the spirit may be that presumes in favor of marriage and legitimacy, the presumption, to be warranted, must be justified by the particular facts of a case, and consonant with what most nearly effects justice in such case."

This principle so expressed we adopted in the original opinion. We have merely elucidated it more fully in this opinion, grasped its scope more clearly, and made a more full and complete application of the facts, circumstances, relations, and inferences to be drawn therefrom bearing upon the question as to which is the right, just, and correct conclusion and is most consonant with reason; and we now proceed to make application of the facts in the instant case that reconfirms us that the conclusion in the original opinion was correct and that the judgment of the trial court was clearly against the weight of all the evidence.

Cammack Brokeshoulder married Ruby Brokeshoulder on July 18, 1914, in Carter county, Okla., and thereafter resided with her in Johnston county, Okla. Not quite two years prior thereto he had left Kemper county, Miss., and moved into the state of Oklahoma, and had left in Kemper county, Miss., his wife, Josephine Brokeshoulder, plaintiff in error, and a child by Josephine Brokeshoulder, and the evidence shows that Josephine Brokeshoulder and her child continued to reside in Kemper county, Miss., for more than one year after Cammack Brokeshoulder had married Ruby Brokeshoulder in Carter county, Okla. The evidence shows from the records of Kemper county and a neighboring county, Neshoba county, that no decree of divorce had been procured by either party in either of said counties, and the record further shows that the husband had not procured a divorce in any of the counties to which he had removed. The evidence, however, does show that Josephine Brokeshoulder contracted a marriage with one Edgar Tubby on the 13th day of November, 1915, more than one year after Cammack

Brokeshoulder had contracted his marriage with Ruby Brokeshoulder in Carter county, Okla. Under this state of the record and the proofs and circumstances of the relation of these parties, the marriage of Cammack and Ruby Brokeshoulder on July 18, 1914, in Carter county, Okla., must be held to have been an illegal marriage. If a marriage is illicit in its inception, it is presumed to continue an illicit marriage until the impediment to a legal marriage is removed and a legal marriage subsequent to the removal of the impediment is shown. And under the rules of law prevailing, this burden to remove this presumption rests upon the parties who entered such illicit marriage.

The facts in the case of Cartwright v. McGowen and the case of Rose v. Rose and the case of Barnes v. Barnes, heretofore cited, are almost identical with the instant case. The force and effect of the holdings in the three cited cases, two from Illinois and one from Iowa, in discussing the rule of innocence as applied to the parties under the circumstances such as they are shown to be in those three cases and which we hold to be almost if not exactly identical with the the facts in the instant case, would be to place Josephine in the role of the innocent and Cammack in the role of the guilty person; he having abandoned his wife and child in Mississippi and come into another jurisdiction and in less than two years contracted a marriage in that jurisdiction. The burden would not be placed, under those circumstances, upon Josephine, as held in the case of Cole v. Cole, to prove that Cammack had not procured a divorce in any county to which he had removed, but the record shows that Josephine went farther than the rule laid down in the three cited cases required her to go, since she proved Cammack had not gotten a divorce in any of the counties to which he had removed. She had committed no act up to the time of his illicit marriage with Ruby that would raise any presumptions against her at all. Her marriage with Edgar Tubby did not take place until November, 1915, over 16 months after Cammack had married Ruby. Therefore, there is no rule of presumption that could arise from her marriage with Tubby to aid in legalizing the illicit marriage of Cammack with Ruby. It appears from the record that after Josephine had married Edgar Tubby she only stayed with him a very short time, a month or such. then they separated and did not live together any more. It appears, therefore, that there cannot be any presumption arise from such marriage under such state of facts and under the rule laid down in the first par-

agraph of the syllabus of Barnes v. Barnes, heretofore quoted. In any event, this second marriage cannot be invoked, and the presumptions, if any, arising therefrom, to give a legal status to the marriage of Cammack and Ruby. Hence the rule being laid down that a marriage illicit in its conception is presumed to continue in that condition until the impediment is removed and a second legal marriage is shown, after the removal of the impediment, and that the burden of rebutting said presumption rests upon the party who seeks to uphold the legality of said second marriage. Under that rule of presumption they cannot invoke a presumption of divorce procured by Josephine from Cammack by reason of her marriage with Edgar Tubby. This is made to appear from the facts in this case, when we have regard to the evidence of Josephine Brokeshoulder in this case. The evidence in this case shows that she was an Indian, and that Cammack Brokeshoulder was an Indian. She nowhere in her evidence stated that she had procured a divorce from Cammack, either by implication or by direct statement. Her direct statements were all to the effect that she had not procured a divorce. Upon cross-examination of Josephine in the trial court, the lawyer for the defendant in error asked her the following questions, to which she made the following answers:

"Q. Why did you marry when you had a husband? A. Well, I just decided he wasn't coming back."

At another place in the cross-examination she was asked the following questions and made the following answers thereto:

"Q. So you just married without a divorce? A. I heard that he had married. Q. That made you think he had a divorce? A. People told me I was divorced."

As heretofore stated, Josephine and Cammack Brokeshoulder were Indians. Our judgment of Josephine from the record is that she was not of a very high order of intelligence, and that she had the Indian way of looking at things. Our inference from her answers to these questions was that, having heard that Cammack had remarried, she assumed that she had a right to remarry also; in other words, that the effect of his second marriage was to divorce her. This would indicate an innocent purpose on her part in entering into the second marriage, and we think that the following rule taken from the case of Hilton v. Roylance (Utah), 69 Pac. 606, would apply here:

"Where a woman who was married under the sealing ceremony of the Mormon Church obtained a 'church divorce' and, believing such divorce to be valid, went through a marriage ceremony with another man, and lived with him as his wife, she was not thereby estopped, on learning that her divorce was invalid, from asserting her first marriage, and denying the legality of the second marriage."

We come to the conclusion, after reviewing a great number of cases, that the rule as to presumptions arising from the facts and circumstances of the instant case is undoubtedly in favor of the plaintiff in error and against the defendant in error, and the undisputed facts showing as they do that the marriage at the time it was contracted between Cammack Brokeshoulder and Ruby Cathey, now Brokeshoulder, was an illicit and void marriage, the presumption of such illicit and void marriage continues until it is shown that the impediment making it illegal has been removed and a legal marriage consummated after the removal of the impediment. The uncontroverted facts furthermore show that, instead of Josephine being the guilty party in this affair of marriages, Cammack was the guilty party, and that he and Ruby had recklessly entered into a second marriage.

To repeat, the record does not show that Josephine had committed any act inconsistent with her marital relation with Cammack Brokeshoulder up to the time he entered into an illicit and void marriage with Ruby Brokeshoulder, and the only inconsistent act proven subsequent to that illicit marriage on the part of Josephine was her marriage with Edgar Tubby, 16 months after the illicit marriage of Cammack and Ruby, and we think that her explanation of how and why she entered into said marriage, because of her station and relation in life and her views of the marital relation, places her in a position of innocence in regard to the second marriage. She had heard that Cammack had remarried, which was true, and her friends had told her she was divorced, meaning, as we infer from her evidence (she having specifically denied that she had ever procured a divorce herself), that Cammack himself had procured a divorce, or else that Cammack's remarriage had the effect of divorcing her.

The attorneys for the defendant in error, in their petition for rehearing, have for the first time raised a question of estoppel. It is really not necessary for this court to consider this in this opinion on rehearing. This question, not having been raised heretofore, would be held to have been waived, but since it has been raised, we will give it some consideration.

We think that the law and the presumptions and facts, as we have heretofore discussed them in this opinion on rehearing, are themselves sufficient answer to this estoppel question, and the reason we have already adduced is in fact an ample and sufficient answer, showing that no estoppel can arise in this case. The rule as to when an estoppel applies in a marriage controversy is found in 26 Cyc. 867-8, as follows:

"It would seem that where a marriage is void ab initio neither of the parties may by their acts become, as against the other, estopped to deny its existence, although it has been held that where one of the parties by false representations as to the nonexistence of a legal impediment has induced the other to enter into the marriage, he will, where the other has continued to act on such representations after the impediment has been removed, be estopped to deny their truth."

In the brief discussion of this estoppel question, we will state, and it will be a repetition of what we have already stated, that there is no act we shown in this record on the part of Josephine Brokeshoulder before and up to the time, and for that matter, even subsequent to the time, of Cammack and Ruby entering into their marriage on the 18th day of July, 1914, that could in any manner be distorted into a plea or an act of estoppel. At the time this second marriage was entered into by Cammack and Ruby, Josephine resided hundreds of miles away from where the transaction took place, and in Kemper county, Miss., where Cammack had married her, where his child by her was born, and from which county he had departed to another jurisdiction, where he had abandoned his wife and child. How in the name of reason and justice this record, up to this time, could be pleaded as an estoppel against Josephine Brokeshoulder, we are unable to see.

There are cases of marital relation where the rule of estoppel may and should be invoked, but it generally arises between the parties to an illicit and illegal marriage where one of the parties was incapable of entering into the marriage relation and had concealed the facts from the other party or specifically represented that they were in a condition to enter into a legal marriage, and the innocent party afterward seeks to invoke the legality of the marriage and the other party seeks to plead an illicit marriage, and property rights arising between them, the courts will not permit the guilty party to plead the illegality of the marriage, and will hold the party estopped to deny the validity of the marriage. But

this example of estoppel that we have just cited is not the instant case, and no principle of estoppel, we hold, arises from the facts in the instant case.

We have no reason to change the rulings in our former opinion; therefore, the petition for rehearing in this case is overruled.

PITCHFORD, V. C. J., and JOHNSON, McNEILL, MILLER, and NICHOLSON, JJ., concur.