# SY JOC LIENG *v.* GREGORIO SY QUIA.

### APPEAL FROM THE SUPREME COURT OF THE PHILIPPINE ISLANDS.

No. 177.    Argued March 7, 10, 1913.—Decided April 14, 1913.

Every presumption is in favor of the validity of a marriage where the marital relations have continued uninterruptedly for over forty years without any question being raised or right asserted by anyone claiming under an earlier marriage of one of the parties until more than ten years after the death, and five years after the distribution of the property, of that party.

The validity of such a marriage should not be impugned except upon clear, strong and unequivocal proof; nor in the absence of such proof will this court reverse the judgment of the lower court sustaining its validity when attacked by those who had opportunity to do so before the death of both spouses.

16 Phil. Rep. 137, affirmed.

THE facts, which involve conflicting claims to the estate of a Chinese merchant domiciled in the Philippine Islands and of the validity of his marriage, are stated in the opinion.

*Mr. Jackson H. Ralston,* with whom *Mr. W. Morgan Shuster, Mr. Clement L. Bouvé, Mr. Frederick L. Siddons* and *Mr. Wm. E. Richardson* were on the brief, for appellants.

Mr. *Antonio M. Opisso* and Mr. *James H. Blount* for appellees.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This appeal brings under review a decree of the Supreme Court of the Philippines in a suit involving conflicting claims to the estate of a Chinese merchant domiciled in those Islands and there known as Vicente Romero Sy Quia, who died intestate at Manila in 1894. The appellants, who were plaintiffs in the Court of First Instance, claim as descendants of a marriage between the intestate and Yap Puan Niu, a Chinese woman, said to have been contracted in 1847 at Am Thau, in the Province of Amoy, China. The appellees claim as the descendants of a marriage with Petronila Encarnacion, a Filipino woman, celebrated in 1853 at Vigan, in the Philippines. The principal question here, as in the Insular courts, is whether the proof sufficiently established the Chinese marriage. On this the Insular courts differed, the Court of First Instance finding the marriage adequately proved, and the Supreme Court, one justice dissenting, holding the other way. 16 Phil. Rep. 137. Before coming to the evidence directly addressed to this question it will be well to state the facts about which there is no dispute.

Sy Quia was born at Am Thau, China, in 1822, and went to the Philippines at the age of 12. At first he was located in Manila, but at some time before 1852 went to Vigan and entered the service of a merchant at an annual salary of 200 pesos. During that year he was converted to the Catholic faith and was baptized in the parish church. The next year he married Petronila, the banns being regularly published and the marriage publicly solemnized according to the rites of the church, as a preliminary to which he affirmed under oath, and the civil and ecclesiastical

authorities certified after inquiry, that he was then un-married. Shortly after the marriage he and Petronila took up their permanent home in Manila. They were then without any particular property other than 5,000 pesos which she received from her mother and brought into the conjugal society. He became a merchant, and through their united efforts they accumulated real and personal property amounting at the time of his death to upwards of 600,000 pesos. They lived in a manner becoming the marital state and were universally recognized as husband and wife. Three sons and two daughters were born of the marriage. One of the daughters married and predeceased her father, leaving a son surviving. The other died after the father, leaving the mother as her only heir. Following Sy Quia's death the widow administered the estate, with the aid of the sons, until 1900, when through appropriate judicial proceedings the property was distributed among the widow, sons and grandson as the persons rightly entitled thereto. The present suit was brought in 1905, more than half a century after the marriage, and then for the first time was its validity or its good faith as to either spouse brought in question—a fact which is of particular significance, first, because Yap Puan Niu, the alleged Chinese wife, visited in Manila at the home of a brother of Sy Quia twice during the life of the latter, and, second, because two of the plaintiffs were adults living in Manila at the time of Sy Quia's death and during the eleven years intervening before the suit was brought.

There was testimony, taken by way of depositions in China, tending to show that Sy Quia returned from the Philippines to Am Thau in 1847, when he was 25 years old; that during that year he married Yap Puan Niu, the marriage being properly arranged and celebrated; that he remained at Am Thau three or four years, during which two sons were born of this marriage; that he then returned to the Philippines and Yap Puan Niu continued to reside

at Am Thau, dying there in 1891; that the four plaintiffs are the only living descendants of this marriage, two being grandsons, one a granddaughter, and one a great-grandson. Six of the witnesses in China testified directly to the marriage, and their testimony, if standing alone, would be quite persuasive of its occurrence, notwithstanding some discrepancies in their statements. But this testimony did not stand alone. It was met and contradicted by that of several Filipino witnesses, taken mostly by deposition, to the effect that they had known Sy Quia in Vigan for some years before his marriage to Petronila in 1853, and that he was living there during the period when, according to the opposing testimony, he married Yap Puan Niu and remained in China. One of these witnesses was an aged man, who testified with certainty that he was a student at Manila between 1839 and 1845 and knew Sy Quia there; that he, the witness, was married at Vigan in 1847, and that Sy Quia was living there then. Others of these witnesses gave kindred reasons for their ability to speak with precision concerning Sy Quia's presence at Vigan during the period in question. Still other witnesses gave testimony more or less corroborative of these opposing theories, but it was less direct and was also contradictory.

In addition to this conflicting testimony there was this situation, as before indicated: The Philippine marriage and the forty years of uninterrupted marital life following it were not only established but conceded. While Sy Quia lived the validity of that marriage passed unchallenged and no right was asserted under the one alleged to have occurred in China. More than this, the right of the widow and children of the Philippine marriage to the property acquired during its existence went unquestioned for eleven years after his death and for five years after the judicial distribution of the property.

In these circumstances every presumption was in favor

of the validity and good faith of the Philippine marriage, and sound reason required that it be not impugned and discredited through the alleged prior marriage save upon proof so clear, strong and unequivocal as to produce a moral conviction of the existence of that impediment. The conflicting testimony, isolatedly considered, did not measure up to this standard, and clearly it did not do so if proper regard was had for the probative force of the conduct of all the parties concerned during the many intervening years. Then, too, the lips of Sy Quia and Yap Puan Niu had been sealed by death, and this, with the long interval of time, gave unusual opportunity for the use of fabricated testimony, the untruth of which it would be difficult to expose.

Giving due effect to these considerations, we cannot say that the Supreme Court of the Philippines erred in holding that the Chinese marriage was not adequately proved. Indeed, we regard the evidence as not producing a moral conviction of the existence of that marriage, but as leaving the issue in serious doubt. The decree is accordingly

*Affirmed.*