Rose Walker NORTON, Plaintiff in Error,

v.

Eunice COFFIELD, Executrix of the Estate of A. W. Coffield, Deceased, Defendant in Error.

No. 38275.

Supreme Court of Oklahoma.

Aug. 2, 1960.

Rehearing Denied Dec. 13, 1960.

Finch & Finch, Sapulpa, for plaintiff in error.

Doyle Watson, Drumright, for defendant in error.

BERRY, Justice.

A. W. Coffield, who at one time was also known as Abe Walker, hereafter referred to as "testator", died testate in Creek County, Oklahoma on October 5, 1954. In his will testator bequeathed a life estate in all of his properties to his wife, Eunice, whom he had married in 1921. The remainder was bequeathed to his six living children. The will was offered for probate in the County Court of Creek County on October 15, 1954. Eunice elected to take under the will which was admitted to probate in November, 1954. On January 30, 1956, Rose Walker Norton, hereafter referred to as "Rose", filed a petition in the probate proceedings in which she alleged that she and testator were married in 1893 in Cherokee County, Georgia; that one child, Dollie, was born of this marriage; that Dollie died in 1936; that she (Rose) was the lawful wife of testator at the time of his death and, as testator's wife, elected to take her statutory interest in testator's estate.

A hearing was had on Rose's petition in the County Court following which her asserted claim of share in testator's estate was denied. From the action of the County Court, Rose effected an appeal to the District Court. Following an extended hearing in the District Court, said Court denied Rose's petition and she subsequently effected this appeal.

Testator first married a woman in Texas in the 1890's whose given name was Mary. Of this marriage one child, Frances, was born. Frances, who appeared as a witness, testified that Mary died shortly after Frances' birth in 1892. As a result of personal involvement in Texas shortly before Frances' birth, testator hurriedly left Texas and went to Georgia where he matriculated in a college under the name of "Abe Walker." While a student in Georgia he became acquainted with Rose. In 1893 he and Rose were married. Of this marriage one child, Dollie, was born. Shortly before Dollie's birth in 1895, testator became involved with a young woman and hurriedly left Georgia. He subsequently completed his medical education and apparently practiced medicine in a number of states and in a great many localities from the late 1890's to date of his death.

After leaving Georgia, testator used his true name. In 1905 testator married a woman whose given name was Emma. Of this marriage two children were born. In 1921 this marriage was terminated by a divorce. In 1921 testator married Eunice. Testator and Eunice lived as husband and wife from date of their marriage to date of testator's death. Of this marriage three children were born. The sole grounds upon which the validity of testator's marriages to Emma and Eunice is questioned are that as of dates of said marriages testator and Rose were husband and wife.

In 1907 Rose married Andrew Norton in Georgia. Thereafter Norton and Rose lived together as husband and wife in the community in which Rose was born and in which testator and Rose had lived together as husband and wife. Norton, Rose and their families and friends at all times treated this marriage as a valid marriage.

Rose learned that testator was alive and that he was married to Emma as early as 1917. She also learned of his divorce from Emma and his subsequent marriage to Eunice. Following her marriage to Norton, Rose at no time prior to filing her petition herein claimed to be testator's wife. The claim that she here asserts was therefore only asserted 61 years after testator deserted her, 51 years after testator's marriage to Emma, 49 years after her marriage to Norton, 35 years after testator's marriage to Eunice and 2 years after testator's lips were sealed by death. As a matter of fact, Rose's testimony shows

that she feels that her claim to a portion of testator's estate arises solely from the fact that she should be reimbursed for rearing Dollie. She testified in part as follows:

"Q. Do you consider now that the marriage was dissolved?

"A. What he left there. I think I should receive a portion of it for raising his child and if you had a heart, I think that you would feel the same way.

"Q. Mrs. Norton, you felt right at that time that you did not have to do anything about your marriage?

"A. I thought I had waited long enough." (CM 165)

That her interest has always been solely commercial is evidenced by the fact that upon learning in 1917 or before that testator was alive, she made no effort to obtain a divorce from him and thus, in keeping with her present position, validate her marriage to Norton. Rose's attorneys, of course, predicate Rose's asserted rights to share in testator's estate upon the proposition that she was in fact his lawful wife at the time of testator's death. Rose's testimony shows that to her way of thinking her marriage to Norton was a valid marriage.

The trial court found in part as follows:

"The court further finds that the evidence is conclusive, that the petitioner and claimant herein, Rose Walker Norton, had, from and after approximately the year of 1917, definite knowledge that A. W. Coffield had married another woman, (who was his third wife) and that said petitioner and claimant further knew that in about the year of 1921, the said A. W. Coffield divorced this third wife and that said petitioner and claimant further knew that A. W. Coffield married Eunice Coffield, the executrix herein, during the year of 1922, * * *"

*      *      *      *      *      *

"The court further finds that the evidence herein is sufficient to establish the fact that A. W. Coffield did not divorce Rose Walker Norton."

*      *      *      *      *      *

"The court further finds that the testimony of the petitioner herein, Rose Walker Norton, that she did not get a divorce from A. W. Coffield or A. W. Walker, is not sufficient evidence to overcome the presumption created by law that the ceremonial marriage between Eunice Coffield, the executrix herein, and A. W. Coffield, was a valid marriage; the court further finds that the testimony of the petitioner herein, that she did not get a divorce from A. W. Coffield or A. W. Walker, is not sufficient evidence to overcome the presumption created by law, that the ceremonial marriage between the petitioner herein, Rose Walker Norton, and her present husband, Andrew Norton, was a valid marriage; * * *"

One of the issues presented by this appeal is whether the evidence overcomes the strong presumption that three ceremonial marriages of long standing are valid and that five children born of said marriages are legitimate. We refer to (1) Rose's marriage to Norton in 1895; (2) Emma's marriage to testator in 1905 and the legitimacy of two children born of said marriage; (3) Eunice's marriage to testator in 1921 and the legitimacy of three children born of said marriage. We use the word "legitimacy" in its generally accepted sense and do not wish to be understood as implying that said children are illegitimate for the purpose of inheriting as sons and daughters of testator.

█ It is settled law that where a marriage has been consummated in accordance with the form of the law, the law indulges a strong presumption in favor of its validity; that one who asserts the invalidity of such marriage because one of the parties thereto has been formerly married and the spouse of such former marriage is still living, has upon him the burden of proving that the first marriage has not been dissolved by divorce or by lawful separation. Brokeshoulder v. Brokeshoulder, 84 Okl.

249, 204 P. 284, 34 A.L.R. 441; Harrison et al. v. Burton et al., Okl., 303 P.2d 962; Templeton v. Jones, et al., 127 Okl. 1, 259 P. 543 and cited cases.

After referring to the aforementioned presumption, this Court in the case last above cited quotes from Coachman v. Sims et al., 36 Okl. 536, 129 P. 845 as follows [127 Okl. 1, 259 P. 544]:

" 'The only question, therefore, which is not elementary, is whether or not the mere fact that the plaintiff's third wife was living at the time of his marriage to his fifth wife is sufficient proof that the fifth marriage was in its inception adulterous and bigamous. It will be observed that the evidence is entirely silent as to whether the third wife had been divorced, and whether there had been a separation according to the laws and usages of the Creek Nation. It will also be observed that between the third and the fifth marriage there had been a fourth, and that the fourth wife was dead at the time of the fifth. Under the facts of this case, we are satisfied that, in order to uphold the validity of this marriage, in the absence of an affirmative showing that there had been no lawful separation, the presumption will be that a divorce had been secured. Marriage should not be destroyed on presumption. The law is astute to preserve the sanctity of the marriage relation, the legitimacy of children, and stability of descent and distribution, and therefore presumes innocence and virtue, in the absence of proof. The wisdom of this presumption is rendered apparent by the facts in this case. This rule is well established by the authorities. * * *' "

This will be found at pp. 303–305, Sec. 192, 35 Am.Jur. "Marriages":

"It is one of the strongest presumptions of the law, grounded in public policy favoring and presuming morality, marriage and legitimacy, that a marriage, once being shown, is presumed to be legal and valid, * * *"

*   *   *   *   *   *

"The presumption of validity is especially strong where the legitimacy of children is concerned and where it is supported by what has been the attitude of relatives, friends, and acquaintances of the parties, and it increases in strength with the length of time of marriage. * * *"

At page 892, § 43, 55 C.J.S. Marriage this is said:

"Strength of Presumption. The presumption in favor of the validity of a marriage, although rebuttable, as discussed infra § 45e, is one of the strongest presumptions known. The presumption is, in itself, evidence, and may even outweigh positive evidence to the contrary. The strength of the presumption increases with lapse of time, acknowledgments by the parties to the marriage, and the birth of children; and the fact that the legitimacy of a child may be involved is a factor in sustaining the validity of the marriage."

In view of the fact that the passage of time and recognition and acknowledgment of the validity of the marriage under attack strengthens the presumption that said marriage is valid, and when the legitimacy of children of said marriages is at stake the presumption is further strengthened, the weight to be given said presumption depends upon the facts of each case.

In Sy Joc Lieng et al. v. Sy Quia et al., 228 U.S. 335, 33 S.Ct. 514, 515, 57 L.Ed. 862, a person who claimed to be the offspring of a marriage consummated in 1847 attacked a subsequent marriage consummated in 1853, which latter marriage continued until 1894 when dissolved by death of one of the parties. After referring to the fact that the last marriage was not attacked until some forty years after consummation thereof, the United States Supreme Court said this:

"In these circumstances every presumption was in favor of the validity and good faith of the Philippine mar-

riage, and sound reason required that it be not impugned and discredited through the alleged prior marriage save upon proof so clear, strong, and unequivocal as to produce a moral conviction of the existence of that impediment. The conflicting testimony, isolatedly considered, did not measure up to this standard, and clearly it did not do so if proper regard was had for the probative force of the conduct of all the parties concerned during the many intervening years. Then, too, the lips of Sy Quia and Yap Puan Niu had been sealed by death, and this, with the long interval of time, gave unusual opportunity for the use of fabricated testimony, the untruth of which it would be difficult to expose."

The validity of Rose's marriage in Georgia to Norton is here involved and we, therefore, think it appropriate to refer to the law as promulgated by the Supreme Court of Georgia. In Azar v. Thomas, 206 Ga. 588, 57 S.E.2d 821, 822, the statement is made that the "presumption of the dissolution of the previous marriage grows stronger with the passage of time where the second marriage is not questioned or attacked. 35 Am.Jur. 308, § 196."

When it is remembered that Rose's marriage to Norton was consummated some 49 years prior to her attack on testator's marriage to Eunice, the presumption in Georgia of validity of said marriage is surely so strong that proof showing the invalidity thereof must be "so clear, strong and unequivocal as to produce a moral conviction" that said marriage is invalid.

■ The evidence supporting Rose's contention that she at no time obtained a divorce from testator, is her testimony to said effect. Prior to 1956 the courthouse in each of the counties in Georgia where Rose would be expected to obtain a divorce from testator burned destroying all court records. While this is a coincidence, this fact tends to show the wisdom of the rule to the effect that the presumption under

consideration should strengthen with the passage of time. We are of the opinion that the trial court did not err in finding that Rose's testimony in the foregoing particulars did not overcome the presumption that testator's marriage to Eunice was a valid marriage.

Rose stresses the Brokeshoulder case, supra, and this Court's holding therein that the presumption of validity attending a marriage under attack may be overcome. This is true. But as pointed out, the matter of whether the person attacking a marriage has introduced sufficient evidence to overcome the presumption of validity of the marriage depends upon the length of time that the attacked marriage has continued, whether a successful attack will in effect bring about an adjudication that children of the marriage under attack are illegitimate, and other facts. We are of the opinion that the evidence in this case does not overcome the presumption of legitimacy attaching to the marriages that are questioned by Rose's attack.

■ The record shows that for a number of years after testator left Georgia, he moved from place to place and that he lived in several different states and in a number of different counties within said states. The evidence shows that it was impossible to establish with any degree of certainty the numerous places in which testator resided and the evidence also shows that competent evidence was not introduced that testator did not in fact obtain a divorce in some one of the counties in which he resided after deserting Rose. Rose contends that by deposition or affidavit she has shown that testator did not obtain a divorce from her in any county in which testator is shown to have resided after he left Georgia, but affidavits in this jurisdiction do not represent competent evidence in a case such as is here presented. Rose stresses Frances' evidence to the effect that testator confided in her following his marriage to Eunice that he had not obtained a divorce from Rose. Frances testified that testator told her that he wanted

her to talk to Rose and tell "her approximately what he had and he wanted her to have her share of what he had accummulated over these years." Rose takes the position that Frances' testimony to the foregoing effect stands uncontradicted. We are unable to agree. Testator made a will in which he in fact recognized Eunice as his lawful wife and in which he made no mention of Rose. This action on his part unquestionably tends to impeach Frances' testimony. Moreover, the fact that testator, who was an educated man, married Emma and Eunice and fathered children by each of them shows that he was of the opinion that his marriage to Rose had been terminated by divorce. At p. 221, Sec. 226, 20 Am.Jur. "Evidence" it is stated that "It is presumed that the conduct of men is lawful and in accordance with the rules of morality and that they do not intend to violate the law."

Rose undertook by Frances' testimony to fix the localities in which testator resided after he left Georgia in 1895. In 1895 Frances was only three years old. We therefore find it difficult to believe that Frances would have known or if she knew, would remember the numerous localities in which testator lived from 1895 to 1905. In any event, all of the various localities in which testator resided were not established nor was it proved that testator did not obtain a divorce in some of the counties in which he was shown to have resided.

Rose relies principally upon Brokeshoulder v. Brokeshoulder, supra. The case is readily distinguishable from the instant case. In that case it was possible to definitely fix the localities in which deceased had resided during the time that he could have obtained a divorce from the woman claiming to be his wife and to therefore show that he had not obtained a divorce. The referred-to distinction is made clear by the following quotation from said case [84 Okl. 249, 204 P. 288]:

"[3] The evidence in this record shows that Cammock Brokeshoulder has been a resident of Kemper County, Miss.; that he has also during his lifetime resided in Carter County, Okla., and Johnston County, Okla., and those were the only three counties in any state that he had ever established any permanent residence."

The presumption attending the validity of the questioned marriage is much stronger in this case than in the Brokeshoulder case. We here have the validity of three marriages consummated many years ago in question and we also have the legitimacy of the issue of two of the marriages in question. Rose has not cited a case supporting her contention that the evidence in this case overcomes the strong presumption of validity which attaches to the marriage that she attacks.

In view of the fact that the evidence fails to overcome the strong presumption of legality that attaches to testator's marriage to Eunice, the trial court's finding that testator did not obtain a divorce from Rose is, in fact, clearly contrary to the evidence. See 55 C.J.S. Marriage § 43, p. 892, supra.

We are of the opinion that the trial court's basic finding that the evidence did not overcome the strong presumption of the validity of testator's and Eunice's marriage is clearly sustained by the evidence.

Affirmed.

DAVISON, C. J., and BLACKBIRD, JACKSON and IRWIN, JJ., concur.

WILLIAMS, V. C. J., and WELCH, HALLEY and JOHNSON, JJ., dissent.

WELCH, Justice (dissenting).

In my view this decision does not properly follow or deal with the precedent of our former decisions, and therefore, this may add confusion to the question of what is the law in Oklahoma as applied to such a difficult situation.

The reason for dissenting is that, as I view it, we have several times heretofore held to the contrary as a matter of law, and those former decisions have not been over-

ruled, and, though not followed, are not overruled here; so that until this decision, I thought we had come to the view and legal philosophy in this state, and so announced in our decisions, that when a ceremonial marriage had been fully consummated between two wholly competent parties, that the marital relationship would exist and continue on and on, until dissolved by death of one of the parties, or until dissolved by judicial decree of annulment or divorcement, and that such marital relationship could not be canceled out merely by the voluntary acts of the parties, whether those acts were by agreement, or whether they were wrongful acts, and that neither party to such matrimonial relationship could interrupt the continued existence of the same merely by some voluntary act of such party, even though such voluntary act was a wrongful act, or even if it was the act of purporting by ceremony to marry some other person followed by their living together as though legally married.

In Copeland v. Copeland, 73 Okl. 252, 175 P. 764, the woman standing as claimant there, the same as claimant here, and the man were married in Arkansas in 1877. The man moved to the Indian Territory. In 1881 the woman, claimant, married another man in Arkansas, and in 1899 the man married another woman in the Indian Territory. Upon death of the man in 1914, the question arose whether the woman, claimant, could assert the continuing marriage relationship between her and the man. The action was of course there, as here, between the first wife, or claimant, and the second wife on the other side. There the court held in the syllabus:

"Where a marriage has been consummated in accordance with the form of the law, the law indulges a strong presumption in favor of its validity. One who asserts the invalidity of such a marriage, because one of the parties thereto has been formerly married and the spouse of such former marriage is still living, has upon him the burden of proving that the first marriage has not been dissolved by divorce or lawful separation. Syllabus, Haile **v.** Haile, 40 Okla. 101, 135 P. 1143.

"The evidence of the plaintiffs in this cause, who attack the validity of the marriage of one of the defendants on the ground that she married a person who had a wife living and undivorced, is examined, and held sufficient to meet the above requirements."

There, as here, the trial court found in favor of the second wife, but upon appeal that court was reversed and judgment was rendered in favor of the plaintiff, claimant.

In the case of Brokeshoulder v. Brokeshoulder, 84 Okl. 249, 204 P. 284, 34 A.L.R. 441, the first wife, or claimant, and the man were married in 1908 in Kemper County, Mississippi. In 1912 the man left Mississippi and came alone to Oklahoma, where in 1914 he married the second wife, without any divorcement having occurred between the man and the woman who still resided in Kemper County, Mississippi. Though immaterial perhaps, the first wife or claimant, did file a suit for divorce in Mississippi, but that case went no further than the filing of the petition and there was no hearing or judgment or divorcement. In Kemper County, Mississippi, the first wife or claimant married another man in 1915, and thus the situation remained until March, 1920, when the man died in Johnston County, Oklahoma. The question was whether the first wife as claimant and as plaintiff could rely on this first marriage. There the trial court found for the defendant, that is, the second wife, but on appeal this court, citing the Copeland case, supra, reversed and held in favor of the first wife, who was the claimant and in the same position as the claimant in this case.

In the case of Cox v. Cox, 95 Okl. 14, 217 P. 493, 34 A.L.R. 432, the woman claimant and the man were married in Oklahoma in 1918. Two months later the woman claimant left her husband and in another county in Oklahoma in May, 1920, married another man with whom she continued to live until the death of the decedent in August, 1920, that is, her first hus-

band. There was never any judicial annulment or divorcement between the woman claimant and her first husband. On his death the question arose whether the claimant could continue to claim and to establish the matrimonial relationship based on the first marriage, and could claim as the surviving widow of the man. There, as in the other cases, the trial court held against the claimant wife and on appeal this court reversed the lower court judgment, and it was specifically held as follows:

"Who takes, and to what extent, the property of an intestate decedent, is for legislative determination, and the courts can write no limitations into such statutes.

"The statute fixes the interest which the wife takes in the property of her deceased husband, and no exception is made on account of her conduct, criminal or otherwise.

"Although the wife deserts her husband, and enters into a bigamous marriage with another, with whom she lives until her husband's death, in the absence of a statute, she cannot be precluded or estopped from asserting her interest in his estate."

That case likewise cited and followed the case of Copeland v. Copeland, supra.

I would direct special attention to the late case of United States v. McCarty, 10 Cir., 144 F.2d 341, where the holding of the court is set forth in paragraph two of the syllabus:

"Under Oklahoma law the statutory law of succession or descent is not controlled by equitable considerations, and a surviving spouse is not estopped from inheriting from deceased spouse because surviving spouse abandoned deceased spouse long before and entered into a pretended marriage relationship with another. 84 O.S.1941, § 213."

In that case the court stated in the opinion as follows:

"Under Oklahoma law of descent and distribution, if any person die seized of any estate which is not limited by marriage contract or testamentary disposition, leaving a surviving spouse and one child, the estate must descend to the surviving spouse and one child in equal shares. 84 O.S.A. § 213. Fred Norton, not having been legally divorced from Sallie Norton, was her lawful husband at the time of her decease, although he had long since abandoned her and entered into a pretended marriage with another woman. Copeland v. Copeland, 73 Okla. 252, 175 P. 764; Cox v. Cox, 95 Okla. 14, 217 P. 493, 495, 34 A.L.R. 432. It follows therefore that under the mandate of the statute, he is entitled to share equally with the son in the lands of Sallie Norton as a surviving husband, unless by his unfaithful and unworthy conduct he is estopped to assert his statutory right.

"This identical question was squarely presented to the Oklahoma Supreme Court in Cox v. Cox, supra, and the majority held that unless forbidden by statute, one spouse did not forfeit his or her statutory right to inherit from the deceased spouse although he or she may have abandoned the deceased spouse long before and entered into a pretended marriage relationship with another. The court said it had 'no alternative except to follow the rules of descent or succession as prescribed by the legislative branch of the government,' citing with approval the case of Nolan v. Doss, 133 Ala. 259, 31 So. 969, 970, in which the Alabama court was likewise constrained to follow the mandate of a statute which provided that the personal estate of persons dying intestate without issue should descend to the widow. In holding that the bigamous misconduct of the wife was immaterial to the issue of inheritance under the statute, the Alabama court said that since the statute made no exceptions on account of the wife's conduct, even in cases of voluntary abandonment, 'the law, as it is written,

is plain, and is not within the province of the courts to ingraft upon it any exceptions. As long as the marriage relation, in law, continues, just so long the rights of the wife under the statute exists.'

\* \* \* \* \* \*

" \* \* \* The rule is founded upon the principle that the statutory law of succession or descent is not controlled by equitable considerations. In the very early case of Stegall v. Stegall, 22 Fed.Cas. page 1226, No. 13,351, it was held that a claim of a lawful wife to a distributive share of her husband's estate granted by statute was an absolute right of which she could not be deprived by a court of equity, however unworthy and reprehensible her conduct may have been when judged by equitable considerations. \* \* \*"

"We cannot bring ourselves to the supposition that the Supreme Court of Oklahoma intended to overrule a doctrine so clear-cut and emphatically established without notice or reference to the case which so clearly announced it. We conclude that the Cox case is yet applicable and controlling of our question, and the judgment is affirmed."

This court consistently held before the new statute in 1915 that a man could not be prevented from inheriting from his wife though he murdered her. Holloway v. McCormick, 41 Okl. 1, 136 P. 1111, 50 L.R.A., N.S., 536, and De Graffenreid v. Iowa Land & Trust Co., 20 Okl. 687, 95 P. 624.

All these holdings are founded on the legal philosophy that inheritance is based on the expressed provisions of statutes, and upon nothing else, and those statutory rules cannot be changed upon any equitable consideration or any equitable principle.

In this case Rose the woman claimant is entitled to inherit from this man by our former decisions, and by statute, if she was legally his wife when he died, (though, in the opinion of some, not then his wife

equitably or in good conscience,) since this is purely a matter of statutory law.

I really do think that this rule and the rule of the above cited Oklahoma cases should be followed and applied in this case, in the interest of administering even justice to all alike, since those cases have not heretofore been overruled and are not overruled in this case.

So the question is was Rose legally the wife of decedent at time of his death?

They were certainly legally married in 1893. That was the evidence. The trial court so found and the majority opinion does not question that finding.

How long then did that legal marriage exist? When did it terminate? Did that legal marriage cease to exist on the happening of any one or all of the things emphasized in the majority opinion, that is:

One—When the decedent remarried in the year 1905?

Two—When Rose remarried in the year 1907?

Three—When decedent married again in 1921?

Four—When future children were born to decedent or to Rose?

Five—When Rose and decedent each discovered that the other was living with a subsequent spouse?

Six—When she failed to *claim* that she was his wife for a period of years before he died?

Would it be of any importance that for a period of years before his death Rose "never claimed to be testator's wife?" It was not found important in our other cases. This I suppose because under statute heirship depends upon legal relationship, not upon congenial association or upon any association together at all, not upon a claim or lack of claim of relationship before the decedent died, but on the existence of the legal relationship itself, and upon that alone.

If a living person actually bore a legal relationship to a decedent entitling him or her to inherit part of the estate by statute,

no failure for years to *claim* that relationship before decedent died could affect the right to inherit.

Now a failure to claim a legal relationship for years might be material if there is any question or contest as to whether the legal relationship ever existed. But here it is conceded by all that Rose and the decedent were legally married in 1893.

None of these things or items above listed are sufficient to terminate this legal marriage under our former decisions and by statute. The only way a legal marriage may terminate before death is by judicial annulment or divorcement.

So the question arises were these parties divorced?

Of course in this action the burden was on Rose to prove that there had not been a divorce. She offered evidence to prove that she had not obtained a divorce, and there was no contrary evidence on that. She also offered evidence that decedent had not obtained any divorce from her, and there was no contrary evidence on that point.

The trial court found that the evidence was not sufficient to establish the fact that she had not obtained a divorce. If the majority desire to affirm on that ground, then that stated conclusion would dispose of the case without more, but evidently that specific finding could not be sustained under the record.

The trial court affirmatively found that decedent did not obtain a divorce from Rose. The majority opinion, near the end thereof, seems to be founded on the conclusion that this finding by the trial court, "is, in fact, clearly contrary to the evidence." But the opinion points to no evidence "that testator did obtain a divorce." All the evidence is to the contrary.

It seems to me it is absolutely necessary that there be some evidence that he did obtain a divorce before the finding of the trial court that he did not obtain a divorce could be "clearly contrary to the evidence."

The majority opinion emphasizes the conclusion or presumption that the decedent "was of the opinion that his marriage to Rose had been terminated by divorce."

Could we speculate further that he thought he had obtained a divorce and therefore this is the evidence which the trial court clearly contraried in finding the decedent did not obtain a divorce?

But I doubt if his opinion, or our presumption as to his opinion, should be given any weight at all as evidence.

And if there is any question as to whether he obtained a divorce why not reverse for further trial on that point?

In final analysis it seems to me that we have a case where decedent and Rose were legally married. Thereafter each acted as if there had been a divorce, but under this record there had been no divorce.

Perhaps each assumed the other had obtained a divorce, but this record demonstrates that neither had done so.

If the majority adopts and adheres to the rule that these actions of the parties, and these presumptions of opinions and assumptions of the parties are sufficient to terminate the legal marriage of decedent and Rose, then it seems to me the court has departed from the rule of former decisions though without overruling them.

The facts in Copeland, 73 Okl. and 175 P.; Brokeshoulder, 84 Okl. and 204 P.; Cox, 95 Okl. and 217 P., all supra, very closely parallel the facts here. No legal or material distinction appears. The rule of those cases should not be overlooked in this case. The contentions and legal questions presented in those cases and in this one are essentially the same, or significantly similar.

The quotation in the majority opinion demonstrates the material distinction between this case and the Coachman v. Sims case in that there as quoted "the evidence is entirely silent" as to whether the former wife had been divorced, while here there is some evidence that neither spouse obtained a divorce. The record here is not "entirely silent" on the point.