**Betty COMPTON, Plaintiff,**

v.

**DAVIS OIL COMPANY; HPC, Inc.; Nova Jean Lewis Cecil, Nina Lewis, William A. Lewis, Eve Failor, Lois Lewis Phillips, Cas Lewis, Leta F. Lewis, Anna Louise Lewis Chote, Nettie Ruth Lewis Whittle, Mack R. Lewis, Lark Lewis, Ruth Lewis, Pamela Rae Pierson, Sandra Jo Pierson Heflin and Jerry Heflin, other Unknown Heirs of Davis Lewis, Deceased, Defendants.**

**In the Matter of the ESTATE OF Heirship of Dave LEWIS, Deceased.**

**Nos. C83–0238–B, C83–0297.**

United States District Court, D. Wyoming.

April 29, 1985.

Earl L. Yeakel III, Stubbeman, McRae, Sealy, Laughlin & Browder, P.C., Austin, Tex., Bruce A. Salzburg, Freudenthal Law Offices, P.C., Cheyenne, Wyo., for plaintiff.

Thomas D. Roberts, Morgan, Brorby, Price and Roberts, Gillette, Wyo., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRIMMER, District Judge.

This matter came on regularly for hearing by the Court sitting without a jury. Counsel submitted the case for determination upon the pleadings, trial exhibits, the depositions of William A. Lewis, taken October 9, 1984 and Ruth Joyce Lewis, taken September 13, 1984, and the post-trial briefs upon the elements of common-law marriage under the laws of the State of Texas. The Court, being fully advised in the premises, makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

Nettie M. Schofield was born on October 18, 1888 in the State of Minnesota. At age 13, on November 3, 1900, she was ceremonially married to Reverend Lewis Blanchard Johnson, a minister of the United Brethren Church, in Brook Park, Pine County, Minnesota. He was born January 22, 1876 in Scheller, Illinois, had been ordained at age 16, and was twenty-four (24) years old when he married Nettie. Six (6) months later, on May 20, 1901, Nettie gave birth to her only child, Lyle B. Johnson, in the State of Iowa.

Nettie was of the Catholic religion. The varying religious practices of Nettie and Reverend Johnson created constant conflict and turmoil in their relationship. Soon after Lyle was born they moved to Chicago, Illinois, where L.B. Johnson ministered in an Evangelical United Brethren Church. One day, between 1901 and 1907 or 1908, Nettie returned home from a Catholic mass and found that L.B. Johnson had taken Lyle and left her without notice.

L.B. Johnson remarried in 1908 to Doris Margaret Hamilton, who bore him six (6) children and resided with him in Indiana for nearly fifty years until his death. Reverend Johnson suffered from senility for a few years prior to his death, and succumbed from paralysis of the throat at age seventy-seven (77) a few days after he swallowed his bottom denture.

After L.B. Johnson left, Nettie acquired a job in a restaurant as a waitress in order to support herself. It was at this employment, sometime between 1927 and 1929 that she met the decedent, Dave Lewis, who had been born in Tippah County, Mississippi on June 12, 1890, raised with five (5) brothers and a sister in Ryan, Oklahoma, served in the Navy for many years, and was a veteran of World War I. He was a giant of a man, standing over 6′ 6″ tall. During his tenure in the Navy, Dave was an accomplished wrestler, and was a Navy wrestling champion for more than twelve (12) years. After leaving the Navy, Dave continued to wrestle throughout the country under several aliases, including "Red Devil" and "Killer Jack," but his most popular nickname, and the one by which he was known to Nettie was "Sailor Jack."

After leaving the Navy, Dave Lewis, and his brother Lonnie Lewis, with whom he was very close, had homesteaded on adjacent tracts in Campbell County, Wyoming. On November 24, 1926 Patent No. 988516, covering 320 acres in the NE/4, NW/4 of Section 17, T.54N., R.72W., 6th P.M., Campbell County, Wyoming, was issued to Dave Lewis. On November 24, 1926, the same day, "Dave Lewis, a bachelor, mortgagor" executed a mortgage deed covering such property as security for a loan from L.M. Hanson, mortgagee. On December 3, 1927 "Dave Lewis, an unmarried man, mortgagor" executed a second mortgage deed covering the property as security for a loan from J.S. Hunter, mortgagee. The first mortgage deed was executed by Lewis

in Campbell County, Wyoming, and the second was executed by him in Coconino County, Arizona. It appears Lewis did not reside in the State of Wyoming following the execution of the first mortgage deed described above.

On September 26, 1929 "Dave Lewis & (Mrs. Nettie Lewis) his wife, grantor" executed a "Warranty Deed with Release of Homestead" conveying property in Campbell County, Wyoming not directly in issue in this proceeding to L.F. Heydecker, grantee. They executed this deed in Salt Lake City, Utah. The recitations in this deed contain a waiver and release of all homestead rights, and further state, in part, as follows:

> On this 26 day of September, 1929, before me personally appeared Dave Lewis, and Nettie Lewis his wife to me known to be the persons described in and who executed the foregoing instrument, and acknowledged that they executed the same as their free act and deed, including the release and waiver of the right of homestead, and said wife having been by me first fully apprised of her right and the effect of signing and acknowledging the said instrument....

(notary seal)

/s/ Creighton G. King
Notary Public

Then, on August 11, 1930, "Dave Lewis and Nettie Lewis, husband and wife, grantors" executed a Warranty Deed and Release of Homestead conveying the relevant property to T.L. Platt, grantee, releasing and waiving "all rights under and by virtue of homestead exemption laws of the State of Wyoming" and reserving "all oil, minerals and gas in the above lands" in grantor. This deed was executed by Dave and Nettie in McKinley County, New Mexico. Such instrument contains recitals identical to those set forth above, and bears the signature and seal of Royall S. Smith, Notary Public.

The evidence shows that Dave and Nettie Lewis traveled throughout the United States together between 1929 and 1935 when he was wrestling. They held themselves out and were generally reputed to be, husband and wife. In 1933 or 1934, Dave and Nettie Lewis shared an apartment together in Austin, Texas, on Lavaca Street. While there, they were generally reputed to be married.

On February 26, 1935, Dave Lewis, at age 44, died in Kalispell, Flathead County, Montana, intestate, from a heart attack following a wrestling match that he completed moments before the attack. He owned at death a fee simple interest in the mineral estate described above. His death certificate was witnessed by Lonnie Lewis (or Lon Lewis) and states that Lewis was married at the time of his death. The name of his spouse is omitted, but it is undisputed that the only person to whom Lonnie could reasonably be referring was Nettie.

Dave Lewis was buried in Ralls, Crosby County, Texas, where his parents and various other relatives resided at the time of his death. Nettie Lewis, his brothers, and other relatives attended his funeral. Subsequently Nettie Lewis, on June 11, 1935, filed an application for probate proceedings for Dave Lewis' Estate in the County Court of Crosby County, Texas, relating only to his personal property, stating that the principal part of the defendant's personal property consisted of War Risk Insurance granted by the United States of America to the deceased, that the named beneficiary in the policy was his mother, who predeceased him, so that the proceeds thereof reverted to the estate, and that collection of the proceeds under the terms of the policy required administration of the estate. Nettie Lewis was appointed as administratrix of the estate, and letters of administration issued to her on June 26, 1935. The petition also states that Dave Lewis was a resident of Crosby County, Texas at some point prior to his death.

The estate was never closed. On December 1, 1954 Lonnie Lewis made an application for final settlement of the estate, stating that Nettie Lewis had collected the proceeds of the war-risk insurance policy and that, by the consent of all parties, she

was permitted to keep such proceeds. The application also states that no other assets of the estate were discovered. Lonnie Lewis, William Lewis and various other relatives of Dave Lewis knew of the existence of the mineral estate reserved by Dave Lewis at the time of the application to close the estate. In fact, Nettie Lewis had already issued oil and gas leases upon the premises prior to that time. None of the Lewis heirs ever objected to the appointment of Nettie Lewis as Administratrix of the estate, or to her failure to list the Wyoming property interest; none of them sought to initiate probate proceedings in Wyoming prior to the initiation of this suit; and none of them sought to exercise dominion over such property between 1935 and 1961 during her lifetime. Lonnie Lewis' application also states that on his information and belief Nettie had remarried, and that her whereabouts were unknown to him. The estate was closed on February 28, 1955.

Following Dave Lewis' death, Nettie was married, by ceremonial or common-law marriage, to John Brock. After John Brock died, Nettie was married, by ceremonial or common-law marriage, to Bill Jewell some time prior to 1954. On November 17, 1954 "Nettie (Lewis) Jewell" issued two (2) oil and gas leases covering all or part of the mineral estate described above. On January 23, 1958 "Nettie Lewis Jewell and J.W. Jewell" executed another oil and gas lease covering the same property. Finally, on April 4, 1961 "Nettie Lewis Jewell, formerly Nettie Lewis, a widow" executed another oil and gas lease upon the premises. Throughout her lifetime Nettie Lewis exercised sole and exclusive dominion and control over the mineral estate without objection by the Lewis heirs.

Nettie was reunited with her only son sometime in the 1950's. She died testate following a prolonged illness in Denver City, Yoakum County, Texas at age 73 on May 4, 1961. She was predeceased by J.W. Jewell. Her property was distributed under the terms of a written will to her only son, Lyle B. Johnson, and three surviving children of J.W. Jewell, but the mineral estate was devised solely to Lyle. The will states that Nettie was never divorced, and scratches out the term "Christian" replacing it with "catholic", requesting a "catholic burial" "in keeping with the stations of my life." Her death certificate states her occupation was "Housewife" and that she was widowed. Her estate was closed May 21, 1962.

Lyle B. Johnson died testate in Mt. Carmel, Wabash County, Illinois on August 30, 1967 at age 66 following a heart attack. He was widowed at the time of his death. Probate proceedings were commenced by his daughter, Betty Lou Compton, formerly Betty Lou Pierson, the plaintiff, on February 22, 1968. Lyle Johnson's will gave all of his personal property to plaintiff, and devised the relevant mineral estate to his granddaughters, Sandra Jo Pierson and Pamela Rae Pierson. The total value of Lyle's estate at the time of his death was under $2,000 and summary proceedings were held since no administration was required under Illinois law.

On February 26, 1968 plaintiff, with Sandra Jo Pierson and Pamela Rae Pierson, (a minor) executed an oil and gas lease covering the mineral estate described above. Then on May 15, 1971 plaintiff, her husband Herbert D. Compton, Sandra Jo Pierson and Wyoming National Bank of Casper as Guardian for the Estate of Pamela Rae Pierson, a minor, executed a ratification and Rental Division Order relating to the leases held by the Davis Oil Company upon the relevant mineral estate. Between February 22, 1968 and February of 1972 plaintiff, her husband and two daughters exercised sole and exclusive dominion and control over the mineral estate without objection by the Lewis heirs.

Then, on May 15, 1972, approximately 11 years after Nettie Lewis' death, and approximately 37 years after Dave Lewis' death, Ann Chote executed and filed an heirship affidavit stating Dave Lewis was never married, that Nettie Lewis was not his wife, and that title to the mineral estate passed by intestate succession to his broth-

ers and sister at the time of his death. Commencing in February of 1972 the Lewis heirs began to execute oil and gas leases upon the mineral estate in derogation of the interests claimed by the heirs of Nettie Lewis. The last relevant transaction occurred on December 6, 1984 when Sandra Jo Pierson Heflin and Jerry Wayne Heflin, husband and wife, and Pamela Rae Pierson, a single woman, executed a quit claim deed conveying any interest they might have in the mineral estate to plaintiff.

The value of the mineral estate at the time of Dave's death was under $2,400. Subsequently, a producing oil well was drilled on the premises by Davis Oil Company. The value of production from the well was estimated at $354,999.20, and over $52,000 in royalties and accrued interest are deposited in the registry of the Court pending resolution of the competing claims of the parties. When the cost of production exceeded revenues the producing well was shut in, and the leases in question lapsed. The estimated current value of the estate is $20 per acre, or $3,200.00. The proper distribution of the royalties, and the right of the parties to engage in future leasing activities upon the premises depends upon the Court's determination of the issues presented in this quiet title action.

It is undisputed that Dave Lewis died intestate on February 26, 1935, and that he owned a fee simple interest in the relevant mineral estate at the time of his death. Assuming he was married to Nettie Lewis, the estate passed to her by intestate succession, and title is in plaintiff. But, if Dave and Nettie Lewis were not married at the time of his death, the property would have passed to his sister and five brothers, and title to the property would not be jointly held as follows:

| | |
|---|---|
| Telia Lewis Greer | 4/24 |
| Hardy L. Lewis | 4/24 |
| William A. Lewis | 4/24 |
| Ona Lewis | 4/24 |
| Cas Lewis | 2/24 |
| Lois Phillips | 2/24 |
| Anna Louise Lewis Chote | 1/24 |
| Nettie Ruth Lewis Whittle | 1/24 |
| Lark Lewis | 1/24 |
| Mack Lewis | 1/24 |
| Total: | 24/24 |

The central factual issue to be decided in this action is whether Nettie Schofield Lewis was lawfully married to Dave Lewis at the time of his death on February 26, 1935.

Defendants rely primarily upon the oral testimony of William A. Lewis and Ruth Joyce Lewis in support of their contention that Dave and Nettie Lewis were never married. William A. Lewis is Dave Lewis' sole surviving sibling. He was born on August 2, 1908, approximately 18 years after Dave was born. In his testimony he states that he was raised after Dave Lewis was grown, that he only met him on a few occasions, and did not correspond with him frequently. His testimony indicates that the Lewis family liked Nettie Lewis, and treated her as if she were Dave's wife throughout their lives. The Lewis heirs referred to her as "Aunt Nettie", and Bedford Lewis, one of Dave's brothers, named one of his daughters, Nettie Ruth Lewis Whittle, after Nettie because he was so fond of her. Nettie was described by the Lewis heirs as a "glamorous" woman, and Ruth Lewis testified that Nettie reminded her of Sylvia Sidney.

William Lewis only met Nettie on two occasions, when Nettie and Dave Lewis resided in Austin, Texas for a short time period when William was attending the University of Texas there, and a second time at Dave Lewis' funeral. William testified that he did not know Nettie's last name, which was Lewis at the time, until after Dave's death. He admits that he never discussed the nature of their relationship with Dave or Nettie, that he did not know how long they were together, and that he does not know whether or not Dave was ever married during his lifetime. William remembers no specific conversations concerning Dave and Nettie's relationship during Dave's lifetime, but states that sometime after Dave's death it became "common knowledge" within the Lewis family that Nettie had previously been married, that she never divorced her first hus-

band, and that she was not married to Dave. William does not remember the exact source of this information, and testified that Lonnie, Bedford and Hardy (other brothers of Dave all of whom are now deceased) all knew more about this than he did since the issue was never discussed with him. This "common knowledge" is contrary to the contemporaneous statements made by Lonnie Lewis at the time of Dave's death as set forth in Dave's death certificate. Furthermore, William admits that he does not remember the specific context in which he learned this information, remembers no specific conversations in which it was discussed, and by his own admission has forgotten specific details concerning events which transpired as much as fifty years before his deposition was taken. Even the details he remembers appear to be somewhat confused due to the passage of time. For example, he testified that Dave's mother and father both were alive at the time of Dave's death though the application for probate proceedings filed contemporaneously with the events in question by Nettie states that Dave's mother predeceased Dave.

However, William does remember that Dave and Nettie had a "real tiff" during the time they resided together in Austin, and testified that Dave walked out of their apartment and was "huffy" and "mad" and said he was not "tied to" Nettie and that he would "get rid of her." However, it is undisputed that Dave did not "get rid of" Nettie, and remained with her for the remainder of his life.

Ruth Joyce Lewis was married to Forrest Lewis, who was Dave's nephew through Bedford Lewis. She was born July 7, 1929 and never met Dave Lewis. Ruth met Nettie in the late 1930's when Nettie rented an apartment from Ruth's mother, Ora J. Raymond, in Crosbyton, Texas. At that time Nettie was referred to as Nettie Brock or Mrs. Brock. Ruth knew Nettie was Catholic because Nettie gave Ruth a crucifix when she was a young girl, but Ruth's mother made her return the crucifix because they were of the Baptist faith.

Ruth Lewis also testified that sometime after 1945 it was "common knowledge" within the Lewis family that Nettie had previously been married, had never sought a divorce because she was a Catholic, but was not married to Dave Lewis during the time period they cohabited. Ruth Lewis further testified that sometime in 1957, over twenty-five years prior to the time the deposition was taken, Nettie went to visit Bedford Lewis in a hospital in Amarillo, Texas when Bedford had an operation and was in the intensive care unit. Ruth stated that she and Nettie were sitting alone together in a lounge waiting to visit Bedford when Nettie told Ruth her life story. Ruth testified that Nettie stated she had never divorced her first husband, and said that after she was left alone, she "took up" with Dave Lewis, and after he died she "took up with" John Brock, and after he died she "took up with" J.W. Jewell. Ruth testified that Nettie never used the term "marriage" concerning any of these relationships.

However, the evidence does show that Nettie made representations to the effect that she had been married to Dave Lewis over a period of forty years from 1929 to less than a month before her death in 1961. Nettie Lewis did not unequivocally state that she had never married Dave Lewis, or John Brock, or J.W. Jewell, nor did she ever state that she was never divorced by L.B. Johnson. Any restrictions imposed upon her due to her faith would not have bound L.B. Johnson, and would not have precluded him from divorcing Nettie. The inference that defendants' seek to draw from the conversation with Ruth Lewis is untenable. The argument is that Nettie, due to religious convictions, felt she could not divorce or remarry and chose to live with a series of three men, outside of the bonds of marriage, for a period of nearly forty years. That conclusion is contrary to the weight of the other evidence submitted to the Court.

## CONCLUSIONS OF LAW AND JUDGMENT

■ The Court has jurisdiction over the parties and the subject matter of this pro-

ceeding under 28 U.S.C. § 1332, and venue is properly in the United States District Court for the District of Wyoming. A United States District Court may decide the issues presented in a quiet title action, though its rulings collaterally affect probate proceedings because it determines heirship and entitlement to the decedent's estate. *Harris v. Pollock*, 480 F.2d 42 (10th Cir.1973); *Turton v. Turton*, 644 F.2d 344, 347 (5th Cir.1981); *Rice v. Rice Foundation*, 610 F.2d 471, 475 (7th Cir. 1979); *O'Connor v. Slaker*, 22 F.2d 147 (8th Cir.1927).

■ Once the existence of a marriage is established, a strong, though rebuttable, presumption arises that such marriage is valid. The burden is on the challenging party to show invalidity by clear and convincing evidence. *In re St. Clair's Estate*, 28 P.2d 894, 897 (Wyo.1934); *In re Kiesel's Estate*, 249 P. 81 (Wyo.1926); *Jim's Water Service v. Eayrs*, 590 P.2d 1346 (Wyo. 1979); *Sy Joc Lieng v. Sy Quia*, 228 U.S. 335, 33 S.Ct. 514, 57 L.Ed. 862 (1913). Where the evidence shows a person was married once, and subsequently married a second time, the presumption of validity attaches to the second marriage, and the law presumes that any incapacity resulting from the first marriage was removed by divorce or death prior to the second marriage. *In re St. Clair's Estate, supra; In re Kiesel's Estate, supra; Metropolitan Life Insurance Co. v. Manning*, 568 F.2d 922 (2nd Cir.1977). This presumption increases in strength as time passes. It can be overcome only upon a showing, by clear and convincing evidence, that neither party to the initial marriage obtained a divorce. *Id.; Panzer v. Panzer*, 87 N.M. 29, 528 P.2d 888 (1974); *Matter of Estate of Steinberg*, 34 Or.App. 293, 578 P.2d 487 (1978); *Texas Employer's Insurance Ass'n v. Elder*, 155 Tex. 27, 282 S.W.2d 371 (1955); *Winn v. Wiggins*, 47 N.J.Super. 215, 135 A.2d 673 (1957); *Hill v. Shreve*, 448 P.2d 848 (Okla.1968). After the lapse of a great many years the presumption is especially strong since public policy favors reliance upon the validity of matrimonial relationships. *Id.*

The evidence clearly establishes that L.B. Johnson married Doris Margaret Hamilton in 1908. We presume that marriage, which produced six children, was valid. If it was valid, then there was no legal impediment to the remarriage of Nettie to Dave Lewis.

■ Direct, reliable evidence also establishes that Dave and Nettie Lewis were married, and were husband and wife until Dave's death in 1935. That evidence consisted of the recitals in the two warranty deeds executed by Dave and Nettie as husband and wife, and the statements made by Lonnie Lewis contained in Dave Lewis' death certificate concerning Dave's marital status. Recitals contained in ancient documents, and in documents and records affecting interests in property are admissible as proof of the matters asserted, and constitute strong evidence concerning such matters. *Fed.R.Evid.* 803(14), (15), and (16). The Court is also persuaded by the fact that the conduct of the Lewis heirs over the course of many years prior to 1972 was fully consistent with the recitals in such instruments.

Statements in such ancient documents are admissible due to a rule of necessity as well as to the reliability of such evidence in comparison to any other form of available evidence. Louisell and Mueller, *Federal Evidence*, vol. 2 § 464 (1972); J. Moore, *Moores Federal Practice*, vol. 11 § 803(16) (2nd ed. 1976 and 1982 Supp.); Wickes, *Ancient Documents and Hearsay*, 8 Tex. L.Rev. 451, 461–464 and n. 25 (1930). McCormick, *Evidence*, § 298 (1954), § 323 (2d ed. 1972); 5 Wigmore, *Evidence* § 1573a (Charbourn rev. 1974). Generally the declarant in such documents is not available to testify due to death, and even if not deceased, the declarant is practicably unavailable because of the inevitable loss of memory and confusion resulting from the passage of time. Generally, there will also be a scarcity of other available evidence probative of the matter asserted. Due to the lapse of time the rule reduces the preference for live testimony implicit in the hearsay rule. Eyewitness accounts of

such events are likely to be less reliable than contemporaneous statements recorded in the ancient documents. Louisell and Mueller, *Federal Evidence, supra* § 464.

In addition, recitations in ancient documents remove the risks of error in transmission of information by oral statements. This consideration is especially important where the passage of time tolls the memory and removes the statements from the context in which they were made. Also, such evidence is less likely to be affected by the forces generated by the litigation since they are made in a context where there is less reason to fear a lack of candor, distortion, whether conscious or unconscious, or even deliberate falsehood affected the statements made. *Id.; United States v. School Dist. of Ferndale,* 577 F.2d 1339, 1355 n. 26, 47 A.L.R.Fed. 294, (6th Cir.), *on remand* 460 F.Supp. 352 (E.D.Mich.1978); *United States v. 1078.27 Acres of Land Situated in Galveston Co., Texas,* 446 F.2d 1030, 1033–34 (5th Cir.) *cert. denied sub nom Galveston City Co. v. United States,* 405 U.S. 936, 92 S.Ct. 945, 30 L.Ed.2d 811 (1972).

Similarly, the exception to the hearsay rule concerning records and instruments affecting interests in property is based upon the reliability of such documents. Louisell and Mueller, *Federal Evidence, supra* § 463; J. Moore, *Moores Federal Practice, supra* vol. 11 § 803(15); *Conn. Light & Power Co. v. Federal Power Com'n,* 557 F.2d 349, 354–56 (2nd Cir.1977). Such instruments are executed in relation to serious and carefully planned transactions, and the financial stake in the transaction, plus the obvious reliance upon the truth of statements made in such instruments by third parties are adequate to at least imply that the recitals in such instruments are trustworthy. *Id.* The rule states that subsequent dealings inconsistent with the truth of the statements or purport of the document undermine the presumption of reliability. *Id. Fed.R.Evid.* 803(15). Here the Lewis heirs, with full knowledge of the existence of the mineral estate, acted as if title to the property was in Nettie Lewis and her heirs between 1935 and 1972, a period of 37 years. They failed to assert any objection to her exercise of dominion over the property, and they did not attempt to exercise any dominion over the property on their own behalf until over a decade after Nettie's death.

■ Unambiguous statements set forth in public records and made contemporaneously with the events at issue circumstantially establish that Nettie Lewis and Dave Lewis were husband and wife at least as early as 1929, and remained in that capacity until the time of his death in 1935. Defendant's evidence is inadequate to overcome plaintiff's compelling proof, and fails to persuade the Court that the statements made by Dave Lewis, Nettie Lewis and Lonnie Lewis concerning the marriage relationship were false. At best defendants' evidence indicates that Nettie never divorced L.B. Johnson prior to entering her marriage relationship with Dave Lewis. While such failure would, under other circumstances, affect her capacity to enter a second marriage, the evidence and the presumptions of law establish that this impediment was removed by L.B. Johnson sometime before 1908, nearly 20 years before Nettie met Dave in Chicago. The Court concludes that the second marriage of Nettie Lewis to Dave Lewis was lawful and valid.

■ Even assuming plaintiff's evidence failed to establish the existence of a ceremonial marriage between Nettie and Dave Lewis, still the proof shows a common-law marriage under the laws of the State of Texas. Wyoming does not recognize common-law marriages. *Kinnison v. Kinnison,* 627 P.2d 594 (Wyo.1981); *In re Reeves Estate,* 58 Wyo. 432, 133 P.2d 503 (1943); *In re Roberts Estate,* 58 Wyo. 438, 133 P.2d 492 (1943). However, Wyoming will recognize a common-law marriage established under the laws of another jurisdiction, and gives such marriage the same binding effect it would have in the state in which it was consummated. *Jim's Water Service v. Eayrs, supra; Bowers v. Wyoming State Treasurer, ex. rel. Workmen's*

*Comp. Div.,* 593 P.2d 182 (Wyo.1979); W.S. § 20–11–111 (1977).

The elements necessary to show the existence of a common-law marriage in Texas are as follows: (A) An agreement to marry or be married; followed by (B) cohabitation; and (C) holding out, or representations to others by the couple that they are husband and wife. Texas Family Code Annotated § 1.91 (Vernon 1975); *Shelton v. Belknap,* 155 Tex. 37, 282 S.W.2d 682 (1955). A common-law marriage may be established by circumstantial evidence, and cohabitation combined with holding out or representations to others by the couple that they are husband and wife gives rise to a rebuttable presumption that there was an agreement to be married. Texas Family Code Annotated § 1.91(b) (Vernon 1975). *Collora v. Navarro,* 574 S.W.2d 65 (Tex. 1978); *Persons v. Persons,* 666 S.W.2d 560 (Tex.App. 1 Dist.1984); *Hill v. Smith,* 181 S.W.2d 1015 (Tex.Civ.App.1944); *Humble Oil & Refining Co. v. Jeffrey,* 38 S.W.2d 374 (Tex.Civ.App.1931), *aff'd* 55 S.W.2d 521 (Tex.1932); *Texas Employers' Insurance Ass'n v. Elder,* 155 Tex. 27, 282 S.W.2d 371, 373 (1955). The strength of this presumption, as with the presumption concerning the validity of the marriages, increases in strength with the passing of time. *United States Fidelity & Guaranty Co. v. Dawdle,* 269 S.W. 119, 124, 126 (Tex.Civ. App.1924); *Salvini v. Salvini,* 2 S.W.2d 963, 965 (Tex.Civ.App.1928).

Where, as here, a deed was executed by the couple as husband and wife, containing recitals stating the homestead rights of the grantor's wife were released, and that the spouse was separately examined and the effect of the instrument was explained to her, this conduct is direct evidence of the existence of a common-law marriage since it indicates there was a representation to third parties, and a holding out by the couple, that they were married, and that there was an agreement to be married. *Estate of Claveria v. Claveria,* 615 S.W.2d 164, 167 (Tex.1981); *Persons .v. Persons, supra.*

Under Texas law, when a couple agrees to marry or be married in another jurisdiction not recognizing common-law marriage, and subsequently acquires a Texas domicile or residence, their common-law marriage will be recognized in Texas on evidence of a continuing cohabitation with matrimonial intent and a public holding out. See generally O. Speer and L. Simkins, *Texas Family Law,* §§ 2.8 and 2.19 (5th ed. 1977); *Persons v. Persons, supra; In re Bivian's Estate,* 98 N.M. 722, 652 P.2d 744 (App.1982). Declarations of relatives concerning the marital status of the couple made before the controversy arose and introduced into evidence after the death of the declarant, such as those made by Lonnie Lewis as stated in Dave Lewis' death certificate, are competent evidence to prove the existence of a common-law marriage. *Summerhill v. Darrow,* 94 Tex. 71, 57 S.W. 942 (1900).

The evidence establishes cohabitation in Austin, Texas, substantial contacts with the state, and that there may have been cohabitation at other times in Texas as well. The evidence, with its reasonable inferences, establishes representations to third parties by Dave and Nettie Lewis that they were husband and wife, and a general reputation as being husband and wife in the communities in which they resided. Their conduct in New Mexico, Utah, Montana and elsewhere would presumably continue in Texas in the absence of a contrary showing. Any contrary representations by Dave Lewis in a fit of emotion to a limited audience is inadequate to overcome the clear inference from the evidence that Dave and Nettie by word and by conduct represented themselves to be husband and wife throughout their years together. Defendant's evidence was inadequate to overcome this presumption, or the direct proof submitted by plaintiff. The subsequent cohabitation in Texas by Dave and Nettie was all that was required to complete the common-law marriage under the standards discussed above.

Defendants failed to offer any probative evidence concerning the alleged invalidity

of such marriage, and did not sustain their burden of proving invalidity by clear and convincing evidence. Defendants were handicapped in proving their case due to the passage of time and the transitory life-styles of the relevant parties, but that wound was self-inflicted. The Lewis heirs could have objected to Nettie's conduct in probating Dave's estate as early as 1935, could have asserted claims to the mineral estate and could have initiated probate proceedings in the State of Wyoming any time after 1935 and before Nettie's death in 1961. Although they allege that they knew of the absence of a matrimonial relationship as early as 1935, they waited until after the death of the person in the best position to testify as to these matters, Nettie Lewis, before they asserted their claims. She might have known where to find the marriage and divorce records which counsel have been unable to locate.

The remaining question is whether defendants are entitled to a fractional share of the mineral estate under Wyoming's inheritance laws. The intestate succession provisions in effect at the time of Dave's death were contained in R.S. § 88–4001 (Wyo.1931), which stated, in relevant part, as follows:

.... If such intestate leaves husband or wife and no child nor descendants of any child, then the real and personal estate of such intestate shall descend as follows, to wit: all of said estate up to the sum of twenty thousand dollars ... shall descend and vest in the surviving ... wife, and the balance of such estate over and above the sum of twenty thousand dollars, ... shall descend as follows, to wit: Three-fourths thereof to such surviving ... wife, and one-fourth thereof ... if both parents be dead, to the brothers and sisters, and to the descendants of brothers and sisters (the descendants, collectively, taking the share which their parents would have taken if living), in equal parts.

These provisions continue in effect today, without substantive change. W.S. § 2–4–101 (1977). Defendants allege the valua-

tion of the property should be determined at this time for purposes of deciding whether there would be any amounts over $20,-000.00 which would pass, in part, to the Lewis heirs. However, rights of inheritance vest immediately upon the death of the intestate, and any devolutionary rights must be determined as of that date. *In re Estate of Randall,* 506 P.2d 432 (Wyo. 1973). Defendants concede the value of the mineral estate was well under $20,-000.00 at the time of Dave Lewis' death, and in fact continued to be below that level until recently. The Court concludes that upon the death of Dave Lewis, title to the entire mineral estate passed to Nettie Lewis, and that title is presently in the plaintiff, and should be quieted in her. Therefore, it is

ORDERED and DECREED that title to the mineral estate underlying the NE/4 of Section 17, T.54N., R.72 W., 6th P.M., be, and the same hereby is, quieted in plaintiff; It is further

ORDERED that the Clerk of Court should deliver the royalty payments heretofore paid by Davis Oil Company into the registry of the Court, together with accrued interest thereon to plaintiff, and that plaintiff recover of defendants her cost of action. It is further

ORDERED, DECREED and ENJOINED that defendants should forthwith cease leasing activity, and should refrain from any other activities relating to said mineral estate in derogation of the plaintiff's title thereto.